UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at Covington

| | | |
|---|---|---|
| CELLMARK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:24-cv-00181-SCM-CJS |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ROBERT WEBSTER, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Rob Webster was a highly compensated salesman for CellMark, Inc., until he quit his job in the summer of 2024. Webster had grown frustrated with various aspects of his employment at CellMark, and he was looking for opportunities elsewhere. CellMark believes that Webster did not go about pursuing those opportunities the right way. It claims that Webster conspired to divert clients and trade secrets to competitors in the hope of going to work for one of them. In CellMark's view, Webster's conduct violated restrictive covenants that he was under, breached the fiduciary duties that he owed to CellMark, and violated state and federal trade-secrets laws. Webster disputes all of this and argues that it is actually CellMark who is in the wrong. He contends that CellMark failed to pay everything it owed him during his employment, defamed him, and tortiously interfered with his contractual relations by strong-arming his new employer into sidelining him for a year and not allowing him to earn commissions.

Webster and CellMark now seek summary judgment on their various claims and counterclaims.  In particular, CellMark has gone on the offense and moved for partial summary judgment on some of its own claims against Webster, and it has also defensively moved for summary judgment on all of Webster's counterclaims.  Likewise, Webster has gone on the offense and asked for summary judgment on some of his counterclaims against CellMark, and he has defensively moved for summary judgment on all of CellMark's claims against him.  Neither party is entitled to an offensive summary judgment.  Thus, those motions will be denied.  And Webster is also not entitled to summary judgment on his defensive motion for summary judgment against CellMark's claims.  However, CellMark is entitled to summary judgment on some of Webster's counterclaims—specifically, the breach-of-contract, wage-and-hour, and defamation *per se* claims.  Accordingly, all of CellMark's claims against Webster must be resolved by a trial, and Webster's tortious-interference claim must also be resolved by a trial.

CellMark has also made a variety of claims against Fortex Americas, LLC, and two of its employees, Dinah Bowman and Göran Sohl.  Fortex is one of the companies to which Webster allegedly diverted clients and trade secrets.  CellMark has alleged that Fortex, Bowman, and Sohl aided and abetted Webster's breaches of his fiduciary duties, committed tortious interference with CellMark's contractual relations, violated state and federal trade-secrets laws, committed fraud, and were involved in a civil conspiracy with Webster.  CellMark has offensively moved for partial summary judgment on its claims against Fortex and Sohl for aiding and abetting breach of

2

fiduciary duty and tortious interference with contractual relations. It is not entitled to summary judgment on those claims. Conversely, Fortex, Bowman, and Sohl have moved for summary judgment on all of CellMark's claims against them. Their motion is well taken as to the aiding-and-abetting-breach-of-fiduciary-duty claim, as well as the fraud claim. But all other claims against these Defendants involve genuine issues of material fact and therefore must be resolved by a jury.

## I.   Facts

Rob Webster began working for CellMark as a paper salesman in 2017. [*See* Dkt. 65-1, Asset Purchase Agreement, at 3, 20]. From 2009 to 2017, Webster worked as a salesman for Semper/Exeter Paper Company, LLC. [Dkt. 106, Dep. of Rob Webster, at 36–38]. CellMark acquired Semper/Exeter in 2017 through an asset purchase agreement (the "APA"). [*See* Dkt. 65-1]. Jimmy Derrico, CellMark's Recycling Division President and member of its board of directors, negotiated the deal for CellMark. [Dkt. 96, Dep. of Jimmy Derrico, at 14]. Because Webster was a shareholder, or "Principal," of Semper/Exeter, he had to sign the APA for the deal to close. [Dkt. 65-1 at 2, 35; Dkt. 101, Dep. of William Sherrard, at 50; Dkt. 144, Webster's Mot. for Summ. J., at 12]. Webster received stock in CellMark's Swedish parent company as part of the deal and consequently agreed to be bound by a Shareholders' Agreement, [Dkt. 65-2]. [Dkt. 65-1 at 22; Dkt. 136-3, Excerpted Dep. of Rob Webster; Dkt. 136-7, Stock Purchase Agreement, at 2].

Webster also signed an Employment Agreement with CellMark. [Dkt. 65-1 at 20; Dkt. 136-3 at 5; Dkt. 65-3, Employment Agreement, at 11; Dkt. 144 at 13]. The

3

Employment Agreement established the terms of Webster's compensation from CellMark and listed his position as being a Sales Rep. of the Semper/Exeter KY & Film Divisions. [Dkt. 65-3 at 2–3].

Each of the agreements contains various restrictive covenants, only some of which are relevant here. The APA contains non-competition and non-solicitation provisions purporting to bind Webster for twelve months following the termination of his employment. [Dkt. 65-1 at 18]. The Shareholders' Agreement contains a non-competition provision purporting to bind Webster while he held any shares and for one year thereafter.[1] [Dkt. 65-2 at 17–18]. The Employment Agreement contains various restrictive covenants purporting to bind Webster for twelve months following the termination of his employment. It includes non-competition and non-solicitation provisions. [Dkt. 65-3 at 6]. Webster sold his CellMark shares in August 2023 and eventually resigned from CellMark on June 7, 2024. [Dkt. 106 at 191, 222].

A. **Webster fosters a relationship between DRC and Duro-Last and seeks employment at DRC.**

In 2023, CellMark began purchasing paper cores from DRC Industries, Inc., and selling them to its customer, Duro-Last, Inc. [Dkt. 136-3 at 23; Dkt. 143-1, Decl. of Rosalinn Hardy, at 2]. Duro-Last was a regular customer of CellMark's throughout Webster's employment at CellMark. [Dkt. 136-3 at 25; Dkt. 143-1 at 1]. In April 2023, a company known as Holcim Solutions and Products US, LLC, acquired Duro-

---

[1] CellMark has asserted that it is not suing Webster for breach of the Shareholders' Agreement. [Dkt. 98, Dep. of CellMark's 30(b)(6) Witness Mark Ohleyer, at 143].

Last to create Duro-Last/Holcim.  [Dkt. 143-1 at 1–2].  Following the acquisition, Duro-Last sought to reduce costs by consolidating suppliers.  [*Id.* at 2].

Around this same time, Webster facilitated introductions between DRC and Duro-Last.  [*See* Dkt. 137-27, Excerpted Dep. of Daniel Click, at 3–4; Dkt. 143-1 at 1]. This included arranging conversations and meetings between Daniel Click, DRC's President, and Rosalinn Hardy, Duro-Last's purchasing agent, and participating in at least one trip taken to Duro-Last's factory in Michigan with DRC representatives in June 2023.  [Dkt. 137-27 at 3–4].  Hardy's boss at Duro-Last later informed Click that Duro-Last intended to begin purchasing directly from DRC, bypassing CellMark. [Dkt. 126, Dep. of Daniel Click, at 86–87].  Discussing the issue of direct purchasing with Hardy soon after that revelation, Webster attempted to explore ways for CellMark to provide better service to Duro-Last, but he eventually helped facilitate Duro-Last's continued transition to direct purchasing from DRC.  [Dkt. 106 at 227– 29]. Webster stated in his deposition that he aided in that transition despite potential harm to his own business at CellMark because both DRC and Duro-Last were still his customers and he wanted to keep the relationship healthy for potential future opportunities.  [*Id.* at 232].

Webster continued to be part of the relationship between DRC and Duro-Last throughout 2023 and into 2024, including instructing Scott Durham at DRC to contact Duro-Last directly to get it set up as DRC's customer.  [*Id.* at 237–38; Dkt. 136-3 at 25; Dkt. 136-58, E-mail, Durham to Hardy, at 4].  Duro-Last began buying paper cores directly from DRC on February 9, 2024, rather than using CellMark as a

5

broker.  [Dkt. 137-30, Messages, Puckett and Click, at 3–4; Dkt. 143-1 at 2].  Even though CellMark was no longer acting as a broker between DRC and Duro-Last, Webster continued to guide pricing between DRC and Duro-Last after that time. [Dkt. 136-59, Excerpted Dep. of Candace Puckett, at 3, 5; Dkt. 137-30 at 4].

Webster began having formal employment discussions with DRC by late 2023. [*See* Dkt. 136-4, E-mail, Webster to Click, at 2].  Earlier that year, in July 2023, Webster suggested to Click that he was dissatisfied with his position at CellMark. [Dkt. 137-27 at 4].  Discussions progressed throughout the year, with DRC e-mailing Webster a proposed compensation arrangement in November 2023.  [Dkt. 136-4 at 2]. That e-mail noted that Webster had a 12-month non-solicitation agreement to deal with, but DRC wanted to "help out" during that time.  [*Id.*].  Webster replied in March 2024 with details regarding his compensation at CellMark so they could continue compensation discussions.  [*Id.*].

Webster resigned from CellMark on June 7, 2024.  [Dkt. 106 at 191].  On July 11, 2024, DRC notified CellMark via letter that it intended to hire Webster.  [Dkt. 65-4, July 11, 2024 Letter, at 2].  The letter stated that DRC was aware of Webster's contractual non-disclosure and non-solicitation obligations and that DRC would ensure that those obligations were honored.  [*Id.* at 2–4].  DRC was aware of those contractual obligations because Webster had provided DRC with copies of the APA, the Shareholders' Agreement, and the Employment Agreement.  [Dkt. 126 at 162– 63].  After explaining the measures DRC would take to ensure compliance with Webster's obligations, the letter provided CellMark with a list of accounts that would

be transitioned to Webster, and it asked CellMark to notify it if Webster's involvement with any of those customers would violate any of his contractual obligations to CellMark. [Dkt. 65-4 at 3–4]. The letter also stated that DRC had an existing customer relationship with Duro-Last, but that Webster "will have no responsibility for, and will not be soliciting any business from (either directly or indirectly) Duro/Holcim." [*Id.* at 4].

DRC's letter stated that it was sent "[i]n the spirit of transparency and to avoid a legal dispute with CellMark." [*Id.* at 3]. But—to put it mildly—CellMark did not appreciate DRC's overtures. On July 30, 2024, CellMark sent a reply letter to DRC stating that hiring Webster raised non-compete issues stemming from the Shareholders' Agreement in addition to the other issues correctly identified by DRC's letter. [Dkt. 65-5, July 30, 2024 Letter, at 2]. CellMark claimed that hiring Webster in the role described "would constitute aiding and abetting Mr. Webster to breach his restrictive covenants with CellMark, and it would give rise to statutory and tort claims against DRC Industries as well as individual claims against Mr. Webster." [*Id.*]. CellMark also demanded that DRC provide—within three days—"copies of all communications between Mr. Webster and DRC Industries regarding CellMark or its customers (including but not limited to Duro/Holcim), technical information about CellMark products, or pricing information." [*Id.*].

As a result of CellMark's letter, DRC ultimately paid Webster to "sit on the sidelines" for a year, meaning DRC did not actually permit him to work as usual

during that time. [Dkt. 126 at 208–09]. Webster says that this caused him to miss out on commissions that he otherwise would have earned. [Dkt. 144 at 32–33].

### B. Webster and Bowman seek employment with Fortex.

Göran Sohl is the President of Fortex Americas, LLC, a paper-trading company. [Dkt. 103, Dep. of Göran Sohl, at 28]. Sohl has been an executive in the paper trade since the 1990s. [*See id.* at 19]. Sohl joined CellMark in the early 2000s after having worked at a different paper-trading company for several years. [*Id.* at 20]. When Sohl moved to CellMark, he maintained his prior relationship with supplier Asia Pulp & Paper ("APP"). [*Id.* at 22; Dkt. 111, Dep. of David Barnes, at 422]. Sohl was employed as an executive at CellMark when CellMark purchased Semper/Exeter, but he resigned from CellMark by the beginning of 2022. [Dkt. 103 at 22–23, 26–27]. He was a shareholder in CellMark's parent company throughout his employment, which means he was subject to the same Shareholders' Agreement as Webster. [*See id.* at 67].

After leaving CellMark, Sohl started Fortex as the American arm of an international paper-trading company. [*Id.* at 28–30]. CellMark and Fortex had some business dealings, with CellMark purchasing some inventory from Fortex. [Dkt. 93, Dep. of Kristin Bain, at 45–47]. Webster stated in his deposition that he viewed Fortex as a competitor to CellMark because "they sell paper as well," although he saw Fortex as a "friendly, trustworthy competitor." [Dkt. 136-3 at 14].

Around the same time as the beginning of Webster's involvement in the relationship with Duro-Last and DRC, Webster also became more involved with Sohl and Fortex. This involvement included employment discussions and facilitating

8

customer relationships with Fortex.  In March 2023, Webster sent Sohl an e-mail containing his sales figures from 2020 to 2023 as well as other statistics specific to his business at CellMark.  [Dkt. 137-1, E-mail, Webster to Sohl, at 2].  He sent that e-mail to Sohl because he was seeking employment at Fortex and wanted to demonstrate his accomplishments.  [Dkt. 136-3 at 13–14].

In April 2023, Webster facilitated a purchase by Fortex from Phoenix Paper, a CellMark supplier with whom Sohl also had a relationship.  [Dkt. 136-3 at 16; Dkt. 136-18, E-mail, Rob Webster to Shelby Kranz & Sohl, at 12].  In an e-mail, Webster requested that Phoenix Paper "help my good friend Göran Sohl out at Fortex" with a business opportunity by supplying Fortex with paper.  [Dkt. 136-18 at 12].  Webster stated in his deposition that he did not seek out that opportunity for CellMark because it was marginally profitable and he wanted to continue to foster goodwill with a supplier that would help CellMark in the future.  [Dkt. 136-3 at 15–16].

Following that interaction with Phoenix Paper, in May 2023, Sohl requested that Webster use his personal e-mail for similar orders.  [Dkt. 137-2 at 3–4].  Sohl also requested Webster's "account details n Corp Info" and suggested that Webster provide the information for his lawn company.  [*Id.*].  In August 2023, Webster sent to Fortex the banking information for his personal entity, Webster Property Management, LLC, to facilitate payment of a commission.  [Dkt. 136-3 at 15–16; Dkt. 136-18 at 2–4].  Webster never received a commission, but he stated in his deposition that it was "incorrect" for him to send his personal business's information rather than CellMark's.  [Dkt. 136-3 at 15].

In the spring of 2024, Webster began facilitating relationships between Fortex and other CellMark customers.  It began with Webster helping set up Fortex as a vendor to CellMark customer R.L. Adams.  [Dkt. 137-4, WhatsApp Messages, Webster & Sohl, at 2].  Sohl considered including Webster in the introductory phone call between Fortex and R.L. Adams but concluded that it was "[m]aybe best not [sic] to avoid issues in case later they are asked."  [Dkt. 137-6, WhatsApp Messages, Webster & Sohl, at 4].  Webster stated in his deposition that he understood R.L. Adams wanted a secondary supplier of paper as the reason why he connected the two, even though both CellMark and Fortex would have ultimately sourced the paper to be sold to R.L. Adams through supplier Finch Paper.  [Dkt. 136-3 at 17].

Webster engaged in similar behavior with CellMark customer G3 Enterprises, Inc., which uses cast-coated paper to make wine and spirits labels.  On March 18, 2024, Webster provided Sohl with a contact at G3, Kristen Whitt.  [Dkt. 137-8, WhatsApp Messages, Webster & Sohl, at 2].  Sohl then e-mailed Whitt stating he "was advised you need to set us up as new vendor related to the cast coated from APP Indonesia."  [Dkt. 137-9, E-mail, Sohl to Whitt, at 8].  Sohl then sent Webster a screenshot of that e-mail and stated, "Done."  [Dkt. 137-8 at 2].  In an e-mail to other Fortex employees, Sohl commented on the new potential G3 account:

> This client that makes all wine labels for Gallo Winery is an account we will get thru a new hire of ours. This account has been serviced during the last 4 years . . . .
>
> First order they will send should be in the USD800k range.
>
> We will send APP cast coated rolls to Chicago for converting and supply sheets to the Winery in California. This process cannot have any roadblocks as we need to show supplier, APP, we can take over the

10

business as this product is at present under exclusivity distribution arrangement with another company.

Once we start placing these orders APP will inform the current distributor that they no longer have access to this grade and that all purchases will have to go thru Fortex Americas.

Margins are in the 30-35% level.

More info to follow.

[Dkt. 136-30, E-mail, Sohl to Elisabeth Karlsson, Linnéa Magnusson, & Jesper Persson, at 2]. Sohl stated in his deposition that the "new hire" referred to in that e-mail was not Webster. [Dkt. 136-16, Excerpted Dep. of Göran Sohl, at 13]. Instead, Sohl says it was another potential new hire named Jack Vogal. [*Id.*]. Sohl agrees the other company with the exclusivity agreement was CellMark. [*Id.*].

The relationship with another cast-coated paper customer of CellMark's, Multi-Color Corporation ("MCC"), was also affected by Webster's actions. In February 2023, Webster executed an exclusivity agreement with APP providing that both would agree not to sell particular weights of cast-coated paper to MCC's competitor. [*See* Dkt. 137-10, E-mail, Webster to Dilip Parikh w/ Attachment, at 4]. The agreement provided that it would be reviewed every 12 months, but Webster failed to renew it in February 2024. [*See id.*; Dkt. 136-46, Messages, Webster & Jamie Runyan, at 3]. Soon after Webster left CellMark in June 2024, APP intimated to CellMark that it would no longer supply CellMark with the product meant for MCC. [Dkt. 136-9, Excerpted Dep. of David Barnes, at 5–6]. Webster continued to solidify the Fortex-MCC relationship by discussing MCC's business after he left CellMark and suggested to MCC's purchaser, Jamie Runyan, that a new exclusivity agreement

11

would be created between Fortex and APP for MCC's benefit. [Dkt. 136-46 at 3]. Runyan's communications suggest that she expected Webster to be involved in the relationship between Fortex and MCC. [Dkt. 137-19, E-mail, Runyan to Dinah Bowman, at 2; Dkt. 137-20, E-mail, Runyan to Ryan Zarbaugh, at 2].

Despite all of this, Fortex never made a formal offer of employment to Webster and he was never officially hired as a salesman. It appears that Fortex made internal preparations to hire Webster but then backed away from that plan once it learned that Webster was subject to non-solicitation agreements. [Dkt. 103 at 206–08; Dkt. 136-16 at 18; Dkt. 136-42 at 2].

But another former CellMark employee, Dinah Bowman, did go work for Fortex. Bowman had originally been a Semper/Exeter employee and then was a customer service representative at CellMark until she left to work for Fortex at the end of May 2024. [*See* Dkt. 94, Dep. of Dinah Bowman, at 28, 96–97]. At the time she left, she had worked in the industry for over 25 years. [*Id.* at 96]. Before CellMark's acquisition of Semper/Exeter, she primarily serviced the customers of Bob Webster—Webster's father. [*See id.* at 12–13]. After Cellmark acquired Semper/Exeter, she transitioned to working with Webster in a hybrid customer service and sales role but did not buy shares in CellMark's parent company. [*Id.* at 32–34]. By the time Bowman left CellMark in 2024, she and Webster had both been unhappy with their employment at CellMark for some time and wanted to leave. [*Id.* at 46–48, 74]. Webster and Bowman discussed their mutual intent to leave as well as the practical effects of, and potential workarounds for, Webster's non-compete

12

obligations. [Dkt. 136-36, Excerpted Dep. of Dinah Bowman, at 3; Dkt. 136-37, iMessage Messages, Webster & Bowman, at 3–5].

Bowman eventually connected with Sohl on May 28 or 29, 2024, resigned from CellMark on May 31, and began working for Fortex on June 2 in an unspecified role. [Dkt. 94 at 93, 96–97; Dkt. 137-14, Text Messages, Bowman & Sohl, at 2]. Soon after joining Fortex, Bowman reached out to some of the customers she serviced at CellMark to notify them that she had moved to Fortex and to solicit their business. [Dkt. 132, Dep. of CellMark's 30(b)(6) Witness Mark Ohleyer vol. II, at 23–24; Dkt. 141, Fortex Defs.' Mot. for Summ. J., at 9]. In her first week, Bowman texted Sohl what Fortex should order from APP to ensure buyers of cast-coated paper were taken care of, and she was prepared to place an order on behalf of G3, who had already been set up in Fortex's system as a customer. [Dkt. 137-14 at 3; Dkt. 137-15, E-mail, Bowman to Whitt, at 2]. Unlike Webster, Bowman did not have an employment agreement or any other contract with CellMark containing restrictive covenants. [Dkt. 96 at 199–200].

Before leaving CellMark, Bowman took a photo on her phone of an e-mail to MCC regarding CellMark's inventory information related to MCC. [Dkt. 94 at 195–96]. She stated in her deposition that she took the picture because she wanted to make sure MCC was taken care of regardless of where she worked. [*Id.* at 196]. She e-mailed the photo from her personal e-mail account to her new Fortex e-mail account on July 11, 2024. [*Id.* at 195–97].

13

### C.    CellMark makes an allegedly defamatory statement.

Following Webster's departure from CellMark, a CellMark employee sent an e-mail to a customer that was previously serviced by Webster. [Dkt. 73-1, Allegedly Defamatory E-mail]. That e-mail states, in relevant part: "We are reviewing your account and were not comfortable with the margins our former employee was getting so we want to go ahead and offer you some new lower pricing." [*Id.*].

### D.    Litigation ensues.

Roughly 60 days after sending DRC the letter objecting to its employment of Webster, CellMark filed the present lawsuit. It sued Webster, Bowman, Sohl, Fortex, and DRC. [Dkt. 1, Compl.]. After extensive motion practice, CellMark filed an Amended and Supplemental Complaint, [Dkt. 64], which is now the operative complaint. It alleges eight claims: (I) breach of fiduciary duty (against Webster); (II) aiding and abetting breach of fiduciary duty (against Bowman, Sohl, Fortex, and DRC); (III) breach of restrictive covenants (against Webster); (IV) tortious interference with contractual relations (against Bowman, Sohl, Fortex, and DRC); (V) violation of the Kentucky Uniform Trade Secrets Act (against all Defendants); (VI) violation of the Defend Trade Secrets Act (against all Defendants); (VII) fraud (against Fortex, DRC, and Bowman); and (VIII) civil conspiracy (against all defendants). [*Id.* at 13–16].

DRC eventually entered into a confidential settlement agreement with CellMark and was dismissed from this case. [Dkt. 107, Joint Mot. to Dismiss DRC; Dkt. 147, Dismissal Order]. The remaining Defendants now move for summary

14

judgment on the claims against them. [Dkt. 141; Dkt. 144]. CellMark opposes their motions and argues on the contrary that it is offensively entitled to partial summary judgment on the issue of liability regarding its claims against Webster for breach of fiduciary duty and breach of restrictive covenants and against Fortex and Sohl for aiding and abetting breach of fiduciary duty and tortious interference with contractual relations. [Dkt. 136, CellMark Mot. for Summ. J., at 1].

CellMark is not the only party asserting claims for relief. Webster has asserted four counterclaims against CellMark: (I) breach of contract; (II) violation of Kentucky's wage-and-hour law, Ky. Rev. Stat. §§ 337.060, 337.070; (III) defamation *per se*; and (IV) tortious interference with prospective business advantage. [Dkt. 65, CellMark Answer & Countercls.]. CellMark now moves for summary judgment on those claims, as does Webster.[2]

## II.    Analysis

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine dispute of material facts exists, the Court considers all facts and draws all reasonable

---

[2] Webster does not move for summary judgment on his defamation *per se* claim. [Dkt. 144, Webster's Mot. for Summ. J.].

inferences in the light most favorable to the non-moving party. *Eaton Corp. v. Angstrom Auto. Grp., LLC*, 167 F.4th 823, 828–29 (6th Cir. 2026). "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

Except for the fraud claim against Fortex and Bowman and the aiding-and-abetting-breach-of-fiduciary-duty claim against Fortex, Bowman, and Sohl, there is sufficient evidence for a reasonable jury to find in CellMark's favor on its claims against the Defendants. Accordingly, Fortex and Bowman are entitled to summary judgment on the fraud claim, and Fortex, Bowman, and Sohl are entitled to summary judgment on the aiding-and-abetting-breach-of-fiduciary-duty claim. But all other claims against the Defendants must proceed to trial.

There is also sufficient evidence for a reasonable jury to find in favor of Webster on Count IV of his Amended Counterclaim, which is his tortious-interference claim. So that claim must proceed to trial as well. But CellMark is entitled to summary judgment on Counts I, II, and III of Webster's Amended Counterclaim—*i.e.*, his counterclaims for breach of contract, wage-and-hour law violations, and defamation *per se.*

**A.      CellMark's claims against the Defendants.**

1.      <u>Claims against Webster only.</u>

CellMark brings two claims against Webster only.  Those are breach of fiduciary duty and breach of contract—*i.e.*, breach of his restrictive covenants. Because a genuine dispute of material fact exists on these two claims, they must be submitted to a jury.

i.      *Genuine issues of material fact preclude summary judgment on CellMark's breach-of-fiduciary-duty claim against Webster.*

A plaintiff seeking to show a breach of fiduciary duty must prove "(1) the existence of a fiduciary duty; (2) the breach of that duty; (3) injury; and (4) causation." *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 193 (Ky. 2013).  Under Kentucky law, "[w]hether a fiduciary duty exists . . . is generally a question of law for the courts to decide as it essentially involves a policy determination."[3] *Scott v. Forcht Bank, NA*, 521 S.W.3d 591, 597 (Ky. Ct. App. 2017) (citing *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 248 (Ky. 1992)).

---

[3] On May 19, 2026, long after summary-judgment briefing closed, Webster filed a "Supplemental Filing on CellMark's Fiduciary Duty Claim," which rehashes his arguments for why he is entitled to summary judgment on the breach-of-fiduciary-duty claim and also argues that the existence of a fiduciary duty must be determined by a jury rather than the Court. [Dkt. 217].  His purported bases for submitting this filing were that the Court had stated at the pretrial hearing that it could decide as a matter of law whether a fiduciary duty exists in this case and that the Court reached this conclusion without the issue having been briefed by the parties. [*Id.* at 1].  But Webster is wrong.  The issue *was* briefed by CellMark.  [*See* Dkt. 137, CellMark's Mem. in Supp. of Mot. for Partial Summ. J., at 17].  That Webster chose not to address this issue in his briefing does not give him the right to file what amounts to a summary-judgment sur-reply.  Accordingly, the Court will strike his Supplemental Filing, [Dkt. 217], from the record pursuant to the Court's inherent authority to

17

While the existence of a fiduciary duty is typically decided by the court as a
matter of law, the analysis can involve questions of fact that must be resolved by a
jury. Specifically, when there are material disputes about the facts underlying a
purported fiduciary relationship, then those disputes must be determined by a jury.
*See Insight Ky. Partners II, L.P. v. Preferred Auto. Servs., Inc.*, 514 S.W.3d 537, 546–
49 (Ky. Ct. App. 2016) (holding that it was for the jury to determine the disputed
issues of fact regarding whether an individual was a fiduciary at the relevant time);
*CSX Transp., Inc. v. First Nat'l Bank of Grayson*, 14 S.W.3d 563, 566 (Ky. Ct. App.

---

control its docket. *See Cincinnati Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
377 F. Supp. 3d 859, 864 (S.D. Ohio 2019).

In any event, the point that Webster makes in his Supplemental Filing is not
necessarily wrong, but neither is it especially relevant. Webster's Supplemental
Filing correctly points out that, under the *Erie* doctrine, the allocation of decisions
between judge and jury is a procedural issue that is governed by federal law. [Dkt.
217 at 1 (quoting *Byrd v. Blue Ridge Rural Elec. Co-op, Inc.*, 356 U.S. 525, 533
(1958))]; *see also Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008)
(holding that the allocation of decision-making authority between the judge and jury
is "a quintessentially procedural determination" (citing *Byrd*, 356 U.S. at 538)). Thus,
according to Webster, this Court should not follow what he perceives to be Kentucky's
rule requiring the Court to decide in all circumstances whether there is a fiduciary
duty. [Dkt. 217 at 1–2]. Instead, Webster says this Court should submit the question
of the existence of a fiduciary duty to a jury. [*Id.*]. But Webster's argument
oversimplifies things and, in doing so, it misconstrues Kentucky law. To be sure,
some decisions from Kentucky courts have used broad language that—in a vacuum—
could be read to say that all questions pertaining to the existence of a fiduciary duty
are to be resolved by courts no matter what. But, in practice, Kentucky courts have
done exactly what federal courts do, which is to decide the existence of a fiduciary
duty as a matter of law when the facts are undisputed. *See, e.g.*, *New World Flooring,
Inc. v. Stock Yards Bank & Tr. Co.*, No. 2020-CA-0884-MR, 2022 WL 127967, at *7
(Ky. Ct. App. Jan. 14, 2022) ("In light of the undisputed facts, we conclude, as a matter
of law, that these circumstances are insufficient to create a fiduciary relationship
between the parties."). Notwithstanding the seemingly broad language in some
Kentucky opinions, Kentucky law does not appear to be any different from federal
law on this point. So there really is no issue to address under the *Erie* doctrine.

1999) (quoting *Wolford v. Scott Nickels Bus Co.*, 257 S.W.2d 594, 595 (Ky. 1953)); *see also New World Flooring, Inc. v. Stock Yards Bank & Tr. Co.*, No. 2020-CA-0884-MR, 2022 WL 127967, at *7 (Ky. Ct. App. Jan. 14, 2022) ("In light of the undisputed facts, we conclude, as a matter of law, that these circumstances are insufficient to create a fiduciary relationship between the parties."); *Taylor v. First Sec. Tr. Bank, Inc.*, No. 2006-CA-001508-MR, 2008 WL 4267847, at *2 (Ky. Ct. App. Sept. 19, 2008) (holding that because the facts relating to the parties' relationship were "generally undisputed," "it was proper for the trial court to decide as a matter of law whether a fiduciary relationship existed" (citing *CSX Transp., Inc.*, 14 S.W.3d 563)).

But when the material facts are undisputed and there is simply a dispute about whether those facts are sufficient to give rise to a fiduciary relationship, then the question is one for the court to decide as a matter of law. In other words, a dispute over the material facts must be resolved by the jury, but a dispute about the *legal significance* of the facts is a question for the court. *See Siemens Energy, Inc. v. CSX Transp., Inc.*, 446 F. Supp. 3d 184, 193 (E.D. Ky. 2020). This case involves the latter as the parties do not really dispute the material facts regarding Webster's employment with CellMark, but instead dispute whether those facts create a fiduciary relationship.

"Under Kentucky law, a fiduciary relationship requires a relationship 'founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such

19

undertaking.'" *ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 715 (6th Cir. 2005) (quoting *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991)). Here, Webster was a shareholder and employee of CellMark. [Dkt. 136-2, Asset Purchase Agreement ("APA"), at 20, 34; Dkt. 144 at 12]. Of course, a shareholder is generally not a fiduciary of the corporation in which he owns shares. *See Griffin v. Jones*, 170 F. Supp. 3d 956, 964 (W.D. Ky. 2016) ("In Kentucky, a stockholder does not owe a fiduciary duty."). And merely being an employee did not make Webster CellMark's fiduciary either. Instead, there must have been "something more" to that employer-salesman relationship for someone like Webster to be a fiduciary. *Cmty. Ties of Am., Inc. v. NDT Care Servs., LLC*, No. 3:12-CV-00429-CRS, 2015 WL 520960, at *7 (W.D. Ky. Feb. 9, 2015). Put differently, a salesman like Webster only owes fiduciary duties if the "specific circumstances of his . . . employment" demonstrate that he is a fiduciary. *Id.* at *6–7; *see In re Sallee*, 286 F.3d 878, 893 (6th Cir. 2002) (A fiduciary duty exists "when circumstances and the relationship of the parties show the parties understood and agree that confidence is reposed by one party and trust accepted by the other."). Such circumstances are present here.

Webster was granted broad access to CellMark's confidential information and used that information in the course of his employment. [Dkt. 156, Webster's Resp. to CellMark's Mot. for Partial Summ. J., at 6 (recognizing that Webster had access to confidential information but arguing that is insufficient to make him a fiduciary)]. Webster often solicited contracts on his own and at least sometimes unilaterally

20

entered into contracts for CellMark. [Dkt. 106 at 48; Dkt. 136-3 at 5–6]. The Employment Agreement he signed acknowledged he would be given "access to and become familiar with various trade secrets and confidential information." [Dkt. 136-6, Employment Agreement, at 6]. The Employment Agreement, APA, and Shareholders' Agreement limited his ability to use CellMark's confidential information. [*Id.*; Dkt. 136-2, at 18; Dkt. 136-8, Shareholders' Agreement, at 17]. And Webster regularly held himself out as being a Vice President of CellMark, despite his internal designation as Sales Rep. [Dkt. 136-3, at 5–6; Dkt. 136-6 at 2 ("Employee hereby accepts Employment, as Employer's Sales Rep.")].

Webster highlights other facts and argues that they preclude a finding that he was a fiduciary. [*See e.g.*, Dkt. 65-3 at 2; Dkt. 97 at 35; Dkt. 106 at 47–48]. But the gist of Webster's argument is that he contests the legal significance of the facts, not the facts themselves. So the material facts are undisputed, which means that his status as a fiduciary can properly be determined as a matter of law.

As CellMark correctly points out, this Court previously denied a motion to dismiss on the ground that—taking the facts alleged as true—CellMark had plausibly alleged that Webster was a fiduciary of CellMark. [Dkt. 137, CellMark's Mem. in Supp. of Mot. for Partial Summ. J., at 17 (citing Dkt. 47, Memo. Op. & Order, at 7–9)]. There, the Court held Webster was plausibly alleged to be a fiduciary when he was alleged to have been granted access to confidential information, he was entrusted with information about CellMark's business strategy, he had authority to solicit contracts on CellMark's behalf, and his Employment Agreement stated that he would

21

be given access to trade secrets and confidential information. [Dkt. 47 at 8–9]. In other words, the Court held that if those allegations proved to be true, then Webster would be considered a fiduciary as a matter of law. And those allegations have proven to be true. Regardless, the undisputed facts allow the Court to conclude as a matter of law that Webster was a fiduciary and owed fiduciary duties to CellMark.

But that does not entitle CellMark to summary judgment on the breach-of-fiduciary-duty claim. At bottom, there are genuine issues of material fact regarding whether Webster breached the fiduciary duties he owed to CellMark. "[T]he fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Regions Bank v. Lenox*, No. 5:18-014-DCR, 2019 WL 320566, at \*2 (E.D. Ky. Jan. 24, 2019) (quoting *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382 (6th Cir. 2016)). CellMark identifies several of its customers or associates whose business it believes Webster diverted for his own personal benefit or the benefits of CellMark's competitor, Fortex. [Dkt. 137 at 19–21]. These business relationships include Phoenix Paper, R.L. Adams, MCC, APP, G3, and Duro-Last. [*Id.*]. But a genuine dispute of material fact exists as to whether Webster breached his fiduciary duties because both parties have produced sufficient evidence upon which a reasonable jury could return a verdict in their favor.

For each of these customers, CellMark has produced evidence that a reasonable juror might view as proof that Webster acted in a way that benefitted

22

himself at CellMark's expense while still employed at CellMark. For Phoenix Paper, CellMark has produced evidence that Webster set up a direct line of communication between Phoenix Paper and Fortex that bypassed CellMark. [*Id.* at 19]. For R.L. Adams, CellMark has produced evidence that Webster worked to ensure R.L. Adams would purchase from Fortex rather than CellMark. [*Id.* at 20]. For MCC and APP, CellMark has produced evidence that he allowed CellMark's exclusivity agreement with them to lapse to CellMark's detriment. [*Id.*]. For G3, CellMark has produced evidence that Webster fostered a relationship between G3 and Fortex such that G3 would stop using CellMark. [*Id.*]. As for Duro-Last, CellMark has shown that Webster curated a direct relationship between Duro-Last and DRC which bypassed CellMark. [*Id.* at 21]. All of this evidence could demonstrate to a reasonable jury that Webster breached his fiduciary duties to CellMark.

But Webster has also produced evidence that could lead a reasonable jury to conclude that he did not breach any fiduciary duties. For Duro-Last and DRC, Webster produced evidence that Duro-Last moved its business for legitimate business reasons other than Webster's conduct. [Dkt. 144 at 49]. For Phoenix Paper, Webster cites evidence that he believed introducing Phoenix Paper and Fortex would foster goodwill with Phoenix Paper that would accrue to CellMark's benefit. [*Id.* at 49–50]. For MCC, Webster points to evidence that CellMark itself did not believe it benefitted from the exclusivity agreement, meaning that its lapse was not a detriment to CellMark. [*Id.* at 50–51]. While Webster acknowledges he gave G3 contact information to Sohl at Fortex, he testified that he thought that it was done for a

legitimate business reason unrelated to fostering a relationship between Fortex and G3. [*Id.* at 51]. And for R.L. Adams Webster cites evidence that he connected it with Fortex because R.L. Adams told CellMark that it wanted two suppliers of paper and making the connection would strengthen his relationship with R.L. Adams in CellMark's favor. [*Id.*]. A reasonable jury crediting Webster's explanations for his seemingly diversionary behavior could conclude that he was acting in CellMark's interests or, at the very least, not against its interests.

Unlike the parties' dispute over the existence of a fiduciary relationship, the parties' argument about whether a fiduciary duty has been breached is not one that concerns how the law should be applied to materially undisputed facts. Instead, the parties' argument over the existence of a breach require weighing the evidence, making credibility determinations, and ultimately figuring out whether Webster was acting for or against CellMark's interests. These are classic fact questions for a jury. And because a reasonable jury could return a verdict for either party based on the evidence before the Court, summary judgment is not appropriate for either party. *See Davis v. Davis*, No. 12-CV-033-GFVT, 2017 WL 1102711, at *6 (E.D. Ky. Mar. 24, 2017). It is the jury's role, not this Court's, to weigh the evidence, evaluate the credibility of the witnesses, and determine whether CellMark's version of events or Webster's is truthful.

    ii. *Genuine issues of material fact preclude summary judgment on CellMark's breach-of-contract claim against Webster.*

CellMark claims Webster breached two of their contracts: the Employment Agreement and the APA. To prevail on a breach-of-contract claim, a plaintiff must

24

prove "(1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract." *Arnold v. Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 774 (E.D. Ky. 2019) (quoting *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009)). No party argues that Webster did not enter into the restrictive covenants at issue or that they are invalid. Instead, the parties dispute whether Webster's actions amount to breach of those covenants.

Both the APA and the Employment Agreement contain similar restrictive covenants limiting Webster's ability to compete with CellMark and to solicit CellMark employees or customers. The APA states:

**7.2** Certain Covenants of Seller and Principals.

(a) Non-Compete. To induce Buyer to enter into this Agreement, Seller and Principals jointly and severally covenant and agree that (i) as to the Principals who enter into employment agreements with Buyer during the period commencing on the date hereof and ending on the later of (A) the date that is twelve (12) months after the termination of the applicable Principal's employment with Buyer, or (B) the date that is three (3) years after the Closing Date, . . . ("Restricted Period"), they shall not, and shall not attempt to, individually or together with others, or by, through or with any affiliate of or subsidiary or entity controlled by or under common control with Seller (Seller and each such affiliate, subsidiary or entity, collectively the "Restricted Parties" and each a "Restricted Party"), directly or indirectly:

> (i) engage in the business competitive with the Buyer in the paper brokerage business and in the converting and marketing of paper, paperboard, plastics and film in the continental United States (the "Restricted Territory"), or

> (ii) call on, solicit, advise, communicate or consult with any Person who is a customer of the Seller during the two-year period prior to the Closing Date or a customer of the Buyer during the Restricted Period for the purpose of soliciting or selling to such Person, or otherwise interfere with any business relationship between Buyer and any such Person or induce any such Person to

terminate, modify or reduce such Person's relationship with Buyer.

(b) <u>Employees of the Business</u>. Each of the Restricted Parties covenants and agrees that during the Restricted Period they shall not, individually or together with others, directly or indirectly, (a) hire, retain, or attempt to hire or retain any person who had been employed by Seller as of the Closing Date who becomes an employee of Buyer, or (b) solicit or encourage any such employee to leave the employment of Buyer or any of its affiliates.

[Dkt. 136-2 at 17–18].

And the Employment Agreement states:

**8. <u>Restrictive Covenants</u>**. Employee agrees that:

**8.1** For a period ending on the later of (a) twelve (12) months after employment with Employer has been terminated, or (b) March 31, 2020 (the "Restricted Period"), Employee will not directly or indirectly solicit or sell any of Employer's products or products similar to those sold by Employer to any person, company, firm, or corporation who is or was a customer of Employer within one (1) year prior to the termination of Employee's employment.  Employee agrees not to solicit such customers on behalf of Employee or any other person, firm, company, or corporation.

**8.2** During the Restricted Period, Employee will not directly or indirectly solicit or sell any of Employer's products or products similar to those sold by Employer to those persons, companies, firms, or corporations who are or were customers of Employer and for whose accounts Employee was responsible while in the employ of Employer.  Employee agrees not to solicit such accounts on behalf of Employee or any other person, firm, company, or corporation.

**8.3** The Employee further agrees not to accept employment by a competitor engaged in the sale of such products during the Restricted Period, for the purpose of representing, selling, or offering such products for sale to Employer's customers.

. . .

**17. <u>Anti-solicitation</u>**. The Employee agrees, in consideration of the mutual covenants set forth herein, that Employee will not, during the Restricted Period, solicit other Employees of the Employer to join the

26

> Employee (new Employer) in an existing or newly formed business, in direct competition with the Employer.

[Dkt. 136-6 at 6–8].

CellMark argues that "[m]ost of Webster's actions that violated his fiduciary duties . . . also constituted breaches of his restrictive covenants." [Dkt. 137 at 23]. These actions implicate genuine disputes of fact regarding Webster's alleged breaches for the same reasons as his alleged breaches of fiduciary duty.

CellMark alleges, for example, that Webster's behavior toward customers R.L. Adams and MCC breached his restrictive covenants. For R.L. Adams, Webster purportedly breached his restrictive covenants when he helped Fortex obtain its business at CellMark's expense. [Dkt. 137 at 23; Dkt. 137-4]. In CellMark's version of events, this would constitute a breach of Webster's restrictive covenants because he was interfering with CellMark's business relationships and soliciting CellMark customers on behalf of a competitor. [*See* Dkt. 136-2 at 17–18; Dkt. 136-6 at 6–8]. But Webster stated that he believed R.L. Adams wanted to have an additional paper supplier, so he connected it with Fortex. [Dkt. 136-3 at 17–18]. In Webster's version of events, he was not acting to help a competitor solicit or compete for CellMark's customers, but rather was acting to further CellMark's interests by keeping a customer happy. The evidence permits a reasonable jury to go either way. So the only permissible outcome is that a jury will have to listen to the evidence and decide which version of events is the truth.

The same goes for Webster's dealings with MCC. CellMark says that Webster breached by helping MCC re-execute the exclusivity agreement between APP and

27

Fortex for MCC's benefit, which was previously between CellMark and APP. [Dkt. 136-46 at 3; Dkt. 137-10 at 4]. But the evidence before the Court is unclear whether the agreement's lapse was Webster's fault and whether he was actually acting on Fortex's behalf when he discussed a new exclusivity agreement with Runyan.

And, to the extent CellMark has argued that Webster diverted business to Fortex through Bowman, competing accounts of the facts likewise preclude summary judgment. Thus, a genuine issue of material fact exists for that dispute as well.

Webster's purported diversion of Duro-Last's business to DRC is no different. While the whole of the record appears to demonstrate that Webster did help facilitate a direct relationship between the two, Webster's testimony suggests that he did so because he thought it would help CellMark out in the long run. [Dkt. 106 at 232]. Again, a reasonable jury could decide for either party depending on whether it credits Webster's explanation.

Another jury question involves CellMark's assertion that Webster improperly solicited CellMark employee Cindy Wurster to work at DRC. [Dkt. 137 at 14]. In support, it cites Webster's testimony that Wurster asked him to suggest a good company to work for and he suggested DRC. [*Id.* (citing Dkt. 136-3 at 27)]. This testimony leaves the issue unclear, and a reasonable jury considering this evidence could decide for either CellMark or Webster on the question of whether this breached Webster's non-solicitation obligations.

At bottom, Webster says that he did not breach his restrictive covenants because he did not compete with CellMark, did not interfere with its business, and

everything he did was for CellMark's best interests and not on behalf of anyone else's interests. Cellmark obviously disagrees. Determining which party is correct depends on how a jury weighs the evidence and whether a jury credits Webster's story or CellMark's story. This makes CellMark's claim wholly unsuited for summary judgment.[4]

### 2.    Claims against the Fortex Defendants only.

CellMark brings two claims against Fortex, Sohl, and Bowman only (collectively, the "Fortex Defendants"). These are aiding and abetting breach of fiduciary duty and tortious interference with contractual relations. The Fortex Defendants move for summary judgment on these claims while CellMark moves for summary judgment on these claims only as to Fortex and Sohl. The Fortex Defendants are entitled to summary judgment on the aiding-and-abetting-breach-of-fiduciary-duty claim, but the tortious-interference claim must be resolved by a jury.

---

[4] Webster argues that CellMark should be equitably estopped from asserting that the restrictive covenants are enforceable. [Dkt. 144 at 41]. This is because Webster says he was told by CellMark employees that the restrictive covenants in the Employment Agreement were no longer valid. [*Id.*]. But this is the first time Webster has raised equitable estoppel as a defense after over two years of litigation, multiple amended complaints, and briefing on a motion to dismiss. Thus, Webster has waived that defense, and the Court will not consider it. Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . estoppel."); *U.S. Fire Ins. Co. v. City of Warren*, 87 F. App'x 485, 491 (6th Cir. 2003). Of course, Webster did plead the affirmative defense of waiver. [Dkt. 51 at 23]. But waiver is distinct from equitable estoppel under Kentucky law. *See Greathouse v. Shreve*, 891 S.W.2d 387, 390 (Ky. 1995) (citing *Barker v. Stearns Coal & Lumber Co.*, 163 S.W.2d 466, 470 (1942)). So Webster did not preserve the defense of equitable estoppel simply by pleading waiver. And because Webster's summary-judgment briefing does not rely on waiver, the Court will not evaluate it at this stage of the proceedings.

In addition to its claims against all of the Fortex Defendants, CellMark also brings a claim of fraud, but only against Fortex and Bowman.  Fortex and Bowman move for summary judgment on this claim, but CellMark does not.  Fortex and Bowman are correct; they are entitled to summary judgment on the fraud claim.

> i.  *Fortex, Sohl, and Bowman are entitled to summary judgment on CellMark's aiding-and-abetting-breach-of-fiduciary-duty claim.*

Under Kentucky law, a claim of aiding and abetting a breach of fiduciary duty has the following elements: "(1) the existence and breach of a fiduciary relationship; (2) the defendant gave the breaching party 'substantial assistance or encouragement' in effectuating the breach; and (3) the defendant knew that the party's conduct breached that fiduciary duty." *Insight Ky. Partners II, L.P.*, 514 S.W.3d at 546 (citing *Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010)).  In this case, the claim fails because there is no evidence that the Fortex Defendants had the requisite knowledge that Webster was breaching fiduciary duties.

CellMark suggests that because the Defendants all communicated via private means—like text messaging, WhatsApp, and personal e-mails—that the Fortex Defendants necessarily knew they were engaged in wrongdoing.  [Dkt. 137 at 22].  It also points out that the Fortex Defendants were aware of Webster's various restrictive covenants.  [Dkt. 154 at 16–17].  For Sohl in particular, CellMark points out that he had a prior history at CellMark and was familiar with the operations of it and Semper/Exeter following the acquisition.  [Dkt. 137 at 22].  But these points do not demonstrate that the Fortex Defendants had actual knowledge that a breach of fiduciary duty was occurring.  And actual knowledge is required under Kentucky law.

30

*Insight Ky. Partners II*, 514 S.W.3d at 551 (actual knowledge required under Kentucky law); *Brunswick TKTKonnect, LLC v. Kavanaugh*, 661 F. Supp. 3d 698, 711 (W.D. Ky. 2023) (quoting *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F. 3d 519, 535 (6th Cir. 2000)).

The operative question is whether the Fortex Defendants knew that they were helping Webster breach a fiduciary duty. This is a different question from whether they participated in a breach of contract, which is addressed by CellMark's tortious-interference claim. [Dkt. 64 at 13–15]. As noted above, whether an employee is a fiduciary is based on the specific circumstances of his employment. *Cmty. Ties of Am.*, 2015 WL 520960, at *6. Webster was not in a position at CellMark that would inherently indicate to the Fortex Defendants that he was a fiduciary. The Court only concluded that Webster was a fiduciary after analyzing a number of facts in light of the relevant law—facts about which there is no evidence the Fortex Defendants had knowledge. That conclusion was not necessarily an obvious one, and there is no evidence that the Fortex Defendants were even aware of all the facts that went into that analysis, much less that they drew the same conclusion that the Court draws. *See Miles Farm Supply, LLC*, 595 F.3d at 666 ("It is by no means clear, to start, that Helena knew it was dealing with fiduciaries.").

It is true that circumstantial evidence can suffice to show the requisite actual knowledge, but no reasonable jury could make such an inference here. *Aetna Cas. & Sur. Co.*, 219 F.3d at 535. Circumstantial evidence is just that—evidence. And here there is nothing but pure speculation that the Fortex Defendants knew that their

conduct was aiding another party's breach of fiduciary duty. To hold that the evidence before the Court shows the Fortex Defendants knew of Webster's fiduciary duties or that they knew their conduct was helping him breach a duty owed would require an inference that cannot be made here. Summary judgment is therefore granted for the Fortex Defendants on CellMark's aiding-and-abetting claim.

> ii. *Genuine issues of material fact preclude summary judgment on CellMark's tortious-interference claim against Fortex, Sohl, and Bowman.*

Under Kentucky law, to establish a claim for tortious interference with contractual relations, a plaintiff must prove: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intent to cause a breach of that contract; (4) that the defendant's actions in fact caused a breach of the contract; (5) that the plaintiff suffered damages as a result of the breach; and (6) that the defendant enjoyed no privilege or justification for its conduct. *Davenport Extreme Pools & Spas, Inc. v. Mulflur*, 698 S.W.3d 140, 155 (Ky. Ct. App. 2024) (quoting *Seeger Enters., Inc. v. Town & Country Bank & Tr. Co.*, 518 S.W.3d 791, 795 (Ky. Ct. App. 2017)). The primary issue here is whether the Fortex Defendants knew of the contracts that Webster was allegedly breaching. As with the aiding-and-abetting claim, actual knowledge is required. *See Outfront Media, LLC v. LeMaster*, 399 F. Supp. 3d 671, 691–92 (E.D. Ky. 2019). The Fortex Defendants say that they did not have such knowledge, but the Court concludes that there is enough circumstantial evidence to permit a reasonable jury to conclude that the Fortex Defendants did have the requisite knowledge.

32

At first glance, this claim is odd because CellMark is relying on breach-of-contract allegations that do not line up with the allegations in its actual breach-of-contract claim. More specifically, CellMark's breach-of-contract claim against Webster alleges that he breached the non-competition and non-solicitation provisions in the APA and the Employment Agreement, but CellMark's tortious-interference claim against Sohl and Fortex is premised on the allegation that they induced Webster to breach an entirely different contract, the Shareholders' Agreement. In other words, CellMark is suing Sohl and Fortex on the theory that they improperly induced Webster to breach the Shareholders' Agreement, but at the same time, CellMark is not suing Webster for breaching that agreement. The Fortex Defendants say CellMark should not be allowed to do this, but they cite no authority for that proposition. Ultimately, the Plaintiff is the master of its complaint, and the Court is not aware of any rule that says Cellmark can only make a tortious-interference claim where it has also made an overlapping breach-of-contract claim.

Unlike with the aiding-and-abetting claim, there is at least some circumstantial evidence from which a reasonable trier of fact could conclude that the Fortex Defendants had the requisite knowledge. A genuine dispute exists regarding Sohl's and Fortex's tortious interference with Webster's obligations under the Shareholders' Agreement. "[A]ctual knowledge can be proved through inference from circumstantial evidence." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 589 U.S. 178, 189 (2020) (quotations and citations omitted). Circumstantial evidence is evidence that allows factfinders to draw an inference that a certain fact is true. *See, e.g., McNeal*

33

*v. City of Blue Ash*, 117 F.4th 887, 895 (6th Cir. 2024) (citing *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021)).  And, here, there is such evidence showing that Sohl—and therefore Fortex—had actual knowledge of the restrictive covenants in the Shareholders' Agreement.  The record demonstrates that Sohl knew of the restrictions in the Shareholders' Agreement because of his prior status as a shareholder.  [Dkt. 136-16 at 7; Dkt. 136-71, WhatsApp Messages, Webster & Sohl, at 3].  Given Sohl's knowledge of the Shareholders' Agreement, one can reasonably infer that he knew about the restrictive covenants within it and knew—if CellMark's version of events is accepted—that Webster was breaching those covenants.  Of course, Sohl is free to argue otherwise, and a reasonable jury could be persuaded that he did not have such knowledge.  But at this juncture, it is enough that a reasonable jury could draw the inference that he did, in fact, possess the requisite knowledge.  Thus, a genuine dispute exists over whether Webster's actions amount to a breach of the Shareholders' Agreement and whether Sohl and Fortex intentionally caused Webster to breach that contract.  Stated differently, CellMark has put forth evidence suggesting Sohl and Fortex acted with the purpose of causing Webster to breach his restrictive covenants, [Dkt. 137 at 25], while the Fortex Defendants have put forth evidence that the same outcomes may have legitimate, non-tortious explanations, [Dkt. 141 at 17–19].  As a result, the question of whether Sohl and Fortex intentionally caused Webster to breach the Shareholders' Agreement must be put before a jury.

There are also genuine issues of material fact as to the tortious interference claim against Bowman, but for different reasons.  There is no evidence suggesting that she knew about the Shareholders' Agreement given that she was not a shareholder in CellMark's parent company.  [Dkt. 94 at 34].  But there is evidence that Bowman knew Webster was subject to some restrictive covenants; she discussed them with him.  [Dkt. 136-36 at 4; Dkt. 136-37 at 3–5].  So there is direct evidence that Bowman knew of Webster's restrictive covenants, and from that, one can reasonably infer that she knew that her conduct was contributing to breaches of those covenants.  While there might be legitimate business reasons for certain customers to have transitioned from CellMark to Fortex unrelated to any wrongdoing by Bowman, one could also reasonably conclude that Bowman helped Webster facilitate the transition of CellMark customers to Fortex despite knowing that it was wrong to do so.  This creates a genuine dispute of material fact that must be put before a jury.

iii.     *Fortex and Bowman are entitled to summary judgment on CellMark's fraud claim.*

There is no evidence supporting CellMark's fraud claim against Fortex and Bowman.  A fraud claim brought under Kentucky law requires proof of: (1) a material representation, (2) that is false, (3) that is known to be false or made recklessly, (4) made with inducement to be acted upon, (5) acted in reliance thereon, and (6) causing injury.  *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).  CellMark alleges Bowman and Fortex committed fraud when Bowman falsely informed CellMark that she did not take any confidential information with her when she left.  [Dkt. 64 at 17].  But CellMark has not produced any evidence supporting its

35

contention that she made that statement knowing it was false or to induce it to act or not act. [*Id.*; Dkt. 154 at 25]. All CellMark has produced on this is argumentation and speculation, which is insufficient to defeat summary judgment. *Jennings v. County of Monroe*, 630 F. App'x 547, 555 (6th Cir. 2015).

Moreover, the connection between the allegedly wrongful conduct and the injury complained of is utterly speculative. CellMark states that, but for the alleged fraud, it could have sought an injunction that would have allowed it to better retain customers. [Dkt. 64 at 17–18; Dkt. 154 at 25]. To prevail under this theory of injury, CellMark would need to show that it could have sought and obtained an injunction had the alleged fraud not occurred, and that the injunction would have allowed it to retain customers. The injury is too speculative and its connection to the alleged misconduct is too attenuated. *Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 762 n.1 (W.D. Ky. 1998) (citing *Vest v. Goode*, 209 S.W.2d 833, 836 (Ky. 1948)). The fraud claim therefore fails as a matter of law.

### 3. Claims against all Defendants.

CellMark brings three claims against all the Defendants—Webster, Bowman, Fortex, and Sohl: (1) a violation of the Kentucky Uniform Trade Secrets Act, Ky. Rev. Stat. § 365.880, *et seq.*, ("KUTSA"); (2) a violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, ("DTSA"); and (3) civil conspiracy. [Dkt. 64 at 15–16, 18]. The Defendants move for summary judgment on all three claims, but CellMark does not.

Because there are genuine issues of material fact on all three claims, summary judgment is inappropriate and the claims must proceed to trial.

> i.      *Genuine issues of material fact preclude summary judgment on CellMark's trade-secrets claims.*

CellMark's KUTSA and DTSA claims against Webster and the Fortex Defendants must proceed to trial, but not on all of the theories proffered by CellMark. Some of the alleged trade secrets lack independent economic value, and therefore cannot form the basis of a trade-secrets claim.

The KUTSA creates a private right of action to recover damages flowing from the misappropriation of trade secrets. Ky. Rev. Stat. § 365.884(1).  To prevail on a KUTSA claim, a plaintiff must show that: (1) a trade secret exists; and (2) that a trade secret has been misappropriated.  *N. Harris Comput. Corp. v. DSI Invs., LLC*, 608 F. Supp. 3d 511, 523 (W.D. Ky. 2022).  The DTSA carries the same elements.  *See C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-CV-379-KKC, 2019 WL 1368621, at *14 (E.D. Ky. Mar. 26, 2019) ("Kentucky's trade secret protection statute is nearly identical to the DTSA.").  Under both the KUTSA and the DTSA, a trade secret is information that derives independent economic value from not being generally known or readily ascertainable by proper means and is the subject of reasonable efforts to maintain its secrecy from the public.  *See United States v. Shanshan Du*, 570 F. App'x 490, 500 (6th Cir. 2014); *C-Ville Fabricating, Inc.*, 2019 WL 1368621, at *14; 18 U.S.C. § 1839(3)(A)–(B); Ky. Rev. Stat. § 365.880(4)(a)–(b).

CellMark alleges that multiple distinct categories of information at issue here constitute trade secrets misappropriated by the Defendants.  These include profit

margins, customer information, the identity of its suppliers, and inventory levels. [Dkt. 64 at 15–17].

Begin with the identity of CellMark's suppliers and the contact information of customers. Such information does not amount to trade secrets because it is readily ascertainable by proper means. In *ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, the Sixth Circuit affirmed the district court's determination that a customer list was not a trade secret because it could have been compiled by proper means. 402 F.3d at 714. That court recognized that courts distinguish between customer lists "discoverable only through extraordinary efforts and . . . through many years' expenditure of time and money . . . , or the purchasers of unusual goods or services not generally known to an industry at large" and, contrariwise, "lists of customers whose identities as purchasers of a given type of product may be obtained through such legitimate channels as telephone books, the internet, or by calling local businesses." *Id.* (citations omitted).

Here, the identities of CellMark's suppliers and the contact information of its customers are analogous to the customer list in *ATC Distribution Group.* CellMark "can point to no evidence that the identities" of its suppliers or customers "[were] obtained through great effort or expense" or that the names of suppliers or customer contact information could not have been determined through a legitimate source. *Id.* Indeed, the Defendants have demonstrated that supplier identities are often reasonably easy to determine through legitimate channels like internet searches. [Dkt. 93 at 42–43]. And the evidence also shows that the identity of paper suppliers

is generally known in the industry, although individual end-customers may not always know their supplier in a particular instance. [*Id.* at 34]. Because the supplier identities and customer contact information here are readily ascertainable through proper means like the internet, they—as a matter of law—are not trade secrets and cannot be the basis for valid trade-secrets claims.

Profit margins, however, are a different story. Webster argues that CellMark's margins are not trade secrets because they have no independent economic value. [Dkt. 144 at 56–57]. Webster cites several cases suggesting that the prices a company charges lack economic value from not being generally known because a customer may do with that info what it pleases, including sharing it with competitors. [*Id.*]. But those cases draw a line between "pure pricing information" and "proprietary pricing formulae" derived from a range of data, including profit margins. *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 519 (E.D. Pa. 2018); *Insight Ky. Partners*, 514 S.W.3d at 555 (price charged not trade secret). Thus, CellMark cannot proceed on a theory that the Defendants violated the law by sharing simple pricing information, but it can proceed based on allegations that its margins or proprietary pricing data were improperly shared. Stated simply, CellMark's margins and proprietary pricing data have independent economic value, and there is evidence in the record indicating that the Defendants misappropriated that data. *Freedom Med. Inc.*, 343 F. Supp. 3d at 519 (finding that pricing schedules are protected trade secrets); *Presidio, Inc. v. People Driven Tech., Inc.*, 686 F. Supp. 3d 652, 684 (S.D. Ohio 2023) ("[P]ricing information can be valuable to competitors . . . ."); [Dkt. 136-30].

Aside from that issue, Webster and the Fortex Defendants also argue that CellMark's margins are not trade secrets because CellMark has not taken reasonable steps to maintain their secrecy. [Dkt. 141 at 22–24; Dkt. 144 at 57–58]. But the Sixth Circuit has recognized that "only in an extreme case can what is a 'reasonable' precaution be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case." *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 301 (6th Cir. 2008) (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 724–25 (7th Cir. 2003)); [Dkt. 154 at 18–19 (arguing *Niemi* applies here)]. For an "extreme case" to lie, "the evidence of reasonable efforts [must be] so utterly lacking in substance as to warrant judgment as a matter of law." *Niemi*, 543 F.3d at 303 (citing *R & R Plastics, Inc. v. F.E. Myers Co.*, 637 N.E.2d 332, 342–43 (Ohio Ct. App. 1993)). This is not an extreme case.

A sufficient dispute exists as to the reasonableness of CellMark's efforts to maintain the secrecy of its margins to require the issue to be submitted to a jury. Depending on the credibility of witnesses, based on the record before the Court, it is conceivable that a reasonable jury could find CellMark's efforts to maintain the secrecy of its margin information were reasonable. This is so in light of the parties' longstanding participation in the industry, the relative sophistication of the parties, and the confidentiality agreements at play here. *See id.*

Webster finally argues that CellMark's inventory levels are not trade secrets because they lack independent economic value derived from not being generally known. [Dkt. 144 at 57–58]. Webster states in support that "CellMark elicited no

40

evidence that it derives independent economic value from its inventory levels." [*Id.* at 58]. CellMark produces some evidence that its inventory levels were confidential, but it fails to produce any evidence supporting that it derives independent economic value from their not being generally known. [Dkt. 154 at 17–21]. CellMark has the ultimate burden of demonstrating the existence of a trade secret, and it has failed to do so regarding inventory levels as it fails to refute Webster's argument. *See N. Harris Comput. Corp.*, 608 F. Supp. 3d at 523–24 (quoting *Dow Chem. Can., Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 346–47 (D. Del. 2012)). Thus, CellMark cannot proceed to trial based on the theory that inventory levels are a trade secret.

To conclude, CellMark cannot base its trade-secrets claims on the alleged misappropriation of supplier identities, customer contact information, simple pricing information, or inventory levels. But it can base its claims on the alleged misappropriation of margins, proprietary pricing information, and other confidential information that constitutes a trade secret. Because there is evidence upon which a reasonable jury could conclude that the Defendants misappropriated such information, summary judgment is not warranted on CellMark's trade-secrets claims, although CellMark's claims will be limited consistent with this opinion.

ii.      *Genuine issues of material fact preclude summary judgment on CellMark's civil-conspiracy claim.*

The Defendants' arguments on the civil conspiracy claim against them is unavailing. Their sole argument is that civil conspiracy is not a standalone claim and that because all of CellMark's other claims fail, this one does too. [Dkt. 141 at 24–25; Dkt. 144 at 58]; *see Mullins v. Carver*, No. 2015-CA-000655-MR, 2016 WL 4934593,

41

at \*23 (Ky. Ct. App. Sept. 16, 2016).  But at least one of CellMark's claims against each of the Defendants survives summary judgment.  CellMark's civil conspiracy theory thus survives.

**B.     Webster's counterclaims against CellMark.**

Webster asserts four counterclaims against CellMark: (I) breach of contract; (II) violation of Kentucky's wage-and-hour law, Ky. Rev. Stat. §§ 337.060, 337.070; (III) defamation *per se*; and (IV) tortious interference with prospective business advantage.  [Dkt. 65].  Webster and CellMark have filed cross-motions for summary judgment on these claims.  CellMark is right about the first three, meaning it is entitled to summary judgment.  But neither party is right about the tortious-interference claim; it must be submitted to a jury.

1.     Webster's breach-of-contract claim fails as a matter of law.

As his principal claim, Webster alleges that CellMark breached the Employment Agreement by failing to pay him performance bonuses.  [Dkt. 65 at 37–38].  To establish a breach of contract, a party must show: (1) the existence of a valid contract, (2) a breach of that contract, and (3) damages stemming from that breach.  *Abma*, 326 S.W.3d at 8.  Here, Webster's claim fails because he cannot show that CellMark breached a contract.

The Employment Agreement contains a provision outlining Webster's compensation.  It states, in relevant part at Section 3.2:

> [Webster] shall be eligible for performance based bonuses (herein "Bonus"), after first contributing $25,000.00 in gross profit from sales invoiced.

> The normal plan outline is as follows:

42

> [CellMark] will allocate a portion of the pre-tax, pre-incentive profit dollars from the Semper/Exeter KY Division into an incentive bonus pool. 37.5% of all the pre-tax, pre-incentive profit in excess of $25,000.00 will be allocated to the Semper/Exeter KY Division Pool. Allocation and distribution from this pool will be as determined by [CellMark], in its discretion, although the following is the presently contemplated allocation:
>
> 90%   Sales Staff, paid in proportion to gross profit generation
> 10%   Customer Service/Support

[Dkt. 138-3 at 1–2]. According to CellMark, that bonus provision does not guarantee that Webster would receive a bonus once he met the $25,000 threshold. [Dkt. 138-1 at 10–11]. Instead, once he met the conditions in that section, he would merely be "eligible" for a bonus and his "eligibility is not entitlement." [*Id.* at 11].

Continuing along this vein, CellMark highlights the immediately preceding provision, Section 3.1, which states that "[Webster] shall be entitled to an annual salary of $100,000.00, paid bi-weekly ($3,846.15 per pay)." [*Id.*; Dkt 138-3 at 1]. CellMark emphasizes that Section 3.1 says "shall be entitled" while Section 3.2 says "shall be eligible." [Dkt. 138-1 at 11–12]. This difference in language supposedly denotes a mandatory obligation in Section 3.1 and a mere non-mandatory expectancy in Section 3.2. [*Id.*]. Webster disagrees, arguing that Section 3.2 created a mandatory obligation on CellMark to allocate and pay out funds as a bonus to him once he met the threshold requirement. [Dkt. 77 at 5–9; Dkt. 155 at 9–10].

The dispute here is over whether Section 3.2 of the Employment Agreement created an obligation on CellMark to pay Webster a bonus once he reached the $25,000 gross profit threshold. Webster says that it did, CellMark says that it did not. It is the Court's job to interpret the words on the page of a contract and

43

determine what their plain meaning requires. *See e.g.*, *Georgetown Chicken Coop, LLC v. Grange Ins. Co.*, 723 S.W.3d 793, 797 (Ky. 2025). Because this is an unambiguous contract, the Court will not consider any extrinsic evidence and will enforce the contract "strictly according to its terms." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) (citations omitted). Doing so here, the Employment Agreement does not require CellMark to pay Webster a bonus even if he hit the threshold requirement.

Reading Section 3.2 plainly, it means that Webster is capable of receiving a bonus once he contributed $25,000 in gross profit from sales invoiced, not that he would necessarily receive a bonus at that point. To be "eligible" means that one is fit or qualified to receive a benefit. *See Eligible*, Black's Law Dictionary (12th ed. 2024); *Eligible*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www. merriam-webster.com/dictionary/eligible (Last accessed May 20, 2026). But merely being qualified to receive something does not mean that one has a *right* to receive that thing. *See e.g.*, *Handmaker v. CertusBank, N.A.*, 189 F. Supp. 3d 663, 669–70 (W.D. Ky. 2016) (being "eligible to participate" in bonus program did not guarantee employee a bonus); *Crane v. Rave Rest. Grp., Inc.*, 552 F. Supp. 3d 692, 704 (E.D. Tex. 2021) (holding that contract language stating that an employee would be "eligible" to participate did not require employer to pay bonus), *rev'd in irrelevant part and aff'd in part*, No. 21-40880, 2023 WL 3735567 (5th Cir. May 31, 2023); *Goldfein v. Envision Physician Servs., LLC*, No. 20-CV-62612, 2022 WL 3681915, at *12 (S.D. Fla. Feb. 3, 2022) ("While Dr. Goldfein might have been *eligible* to receive the bonus, his

eligibility does not mean that he is *entitled* to the bonus."). Instead, one who is eligible for something is not inherently entitled to receive the thing.

Importantly, the immediately preceding section of the Employment Agreement, Section 3.1, uses language that mandates Webster receive the benefit mentioned therein—"[Webster] shall be entitled to an annual salary . . . ." [Dkt. 65-3 at 1]. To be "entitled" to something means that one has a legal right or claim to it. *Entitle*, Black's Law Dictionary (12th ed. 2024); *Entitlement*, Black's Law Dictionary (12th ed. 2024). That word denotes certainty to receive the benefit that is the object of the entitlement and does not carry with it the same uncertainty as mere eligibility.

Because different words were used in Section 3.2 versus Section 3.1, the Court can infer that the two sections have different meanings. *See, e.g.*, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*, 846 F. App'x 332, 342–43 (6th Cir. 2021). By using "shall be entitled" in Section 3.1, the parties imposed on CellMark a mandatory obligation and imbued a right in Webster that does not contemplate any deviation. And by using "shall be eligible" in Section 3.2, the parties agreed to flexibility that would ultimately be controlled by CellMark.

The uncertainty generated in Section 3.2 by using the word "eligible" rather than "entitled" is magnified in light of the remainder of the section. It continues by stating the "normal plan" for allocation of bonuses. [Dkt. 65-3 at 2]. That "normal plan" requires CellMark to allocate funds to a bonus pool but then leaves open how much will be allocated and distributed, stating "[a]llocation and distribution from this pool will be as determined by [CellMark], *in its discretion,* although the following is

45

<u>presently the contemplated allocation</u>."   [*Id.* (emphases added)].   This is further textual evidence that Section 3.2 does not impose on CellMark a mandatory obligation.

Webster points out that certain CellMark representatives or employees have stated that the normal plan outlined in Section 3.2 was actually used to calculate bonuses paid to Webster.  [Dkt. 144 at 29 (citing Dkt. 97 at 54)].  Even assuming this is true, it does not help him.  First, this is an unambiguous, fully-integrated contract, so extrinsic evidence contrary to the plain terms of the agreement will not be considered.  *Frear*, 103 S.W.3d at 106 (stating that a court will interpret an unambiguous contract "by assigning language its ordinary meaning and without resort to extrinsic evidence"); [Dkt. 138-3 at 7].  Second, this is merely an example of CellMark exercising its discretion in calculating what bonuses to pay Webster.  The same discretion that makes the lack of payment of bonuses consistent with Section 3.2 makes the payment of bonuses just as consistent.

To conclude, no reasonable jury could return a verdict in favor of Webster on his breach of contract claim.  This is because Section 3.2 of the Employment Agreement does not impose on CellMark any obligation to pay him bonuses in any particular way.  Instead, that section merely states that he would be eligible for a bonus—meaning he is not certain to receive one.  Any failure to pay bonuses in accordance with that section is therefore not a breach of contract.  CellMark is entitled to summary judgment on Webster's breach of contract claim and Webster is not entitled to summary judgment.

2.      Webster's statutory wage-and-hour claim fails as a matter of law.

Webster claims CellMark violated Ky. Rev. Stat. §§ 337.060(1) and (2) and 337.070 by: (1) improperly withholding wages agreed upon, (2) improperly deducting from wages agreed upon, and (3) deducting from wages without proper documentation or explanation. [Dkt. 65 at 38–39]. Webster conceded at the oral argument on CellMark's Motion to Dismiss his counterclaims that his statutory claims rise and fall with his breach-of-contract claim. Because the Court has determined that CellMark's conduct did not amount to a breach of contract, this claim also fails.

Webster had no choice but to make that concession; the law permits no other conclusion. Ky. Rev. Stat. § 337.060(1) states, in relevant part, "No employer shall withhold from any employee any part of the wage agreed upon." Section 337.060(2) prohibits employers from deducting certain items "from the wages of employees." And Section 337.070 states that employers:

> making deductions from the salaries and wages due said employees, shall state specifically the amount for which the deductions are made, and each such employer at the time of payment of salary or wage to each employee shall furnish the employee a paper or electronic statement giving the amount of each deduction and the general purpose for which the deduction is made.

"Wages" as used in these sections includes "any compensation due to an employee by reason of his or her employment, including salaries, commissions, vested vacation pay, overtime pay, severance or dismissal pay, earned bonuses, and any other similar advantages agreed upon by the employer and the employee or provided to employees as an established policy." Ky. Rev. Stat. § 337.010(c)(1). Thus, the key issue is

47

whether the bonuses Webster seeks were "due."  As the foregoing analysis of his breach-of-contract claim shows, they were not.

As explained above, Section 3.2 of the contract merely provides the criteria by which Webster could become eligible to receive a bonus, then leaves how to pay out those bonuses in CellMark's discretion.  While Section 3.2 does identify a formula by which bonuses could be paid in its "normal plan," the ability to determine what bonuses would be paid to Webster ultimately rested with CellMark in its discretion.  This discretionary nature of the parties' agreement means that the bonuses were neither "wages" nor were they "due."  Thus, as a matter of law, there could not have been a violation of Kentucky Revised Statutes §§ 337.060 or 337.070.  And so CellMark is entitled to summary judgment on Count II of Webster's counterclaims.

3.      Webster's defamation *per se* claim fails as a matter of law.

Webster alleges that the following statement is *per se* defamatory against him: "We are reviewing your account and were not comfortable with the margins our former employee was getting so we want to go ahead and offer you some new lower pricing."  [Dkt. 65 at 39–40; Dkt. 138-2 at 6 (e-mail sole basis for defamation claim); Dkt. 138-20].  According to Webster, that statement is defamatory *per se* because statements that "impl[y] someone is unfit to perform their job can be defamation per se."  [Dkt. 155 at 21].  But that statement, as a matter of law, does not meet the bar required by Kentucky law for claims of defamation *per se*.  So summary judgment must be granted for CellMark on Webster's defamation claim.  [Dkt. 138-1 at 16].

48

To establish a claim for defamation in Kentucky, a plaintiff must show (1) "a false and defamatory statement concerning another"; (2) "an unprivileged publication to a third party"; (3) "fault amounting at least to negligence on the part of the publisher"; and (4) "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Toler v. Süd–Chemie, Inc.*, 458 S.W.3d 276, at 281–82 (Ky. 2014) (quoting Restatement (Second) of Torts § 558 (1977)). A claim of defamation *per se* does not require any proof of special damages as injury to reputation is presumed because of the words used. *See id.*

"Statements classified as defamatory per se include those which attribute to someone a criminal offense, a loathsome disease, serious sexual misconduct, or conduct which is incompatible with his business, trade, profession, or office." *Gilliam v. Pikeville United Methodist Hosp. of Ky., Inc.*, 215 S.W.3d 56, 61 (Ky. Ct. App. 2006). But for a statement to be actionable as defamation *per se*,

> it must be more than annoying, offensive, or embarrassing; the words must "tend to expose the plaintiff to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people," or the statement must "impugn one's competence, capacity, or fitness in the performance of his profession."

*Sandmann v. WP Co. LLC*, 401 F. Supp. 3d 781, 790 (E.D. Ky. 2019) (internal citations omitted) (quoting *Digest Publ'g Co. v. Perry Publ'g Co.*, 284 S.W.2d 832, 834 (Ky. 1955); *Welch v. Am. Publ'g Co. of Ky.*, 3 S.W.3d 724, 735 (Ky. 1999)). When determining whether a statement is defamatory *per se*, a court must "stay within the four corners of the written communication," "[t]he words must be given their ordinary, natural meaning as defined by the average lay person," and "[t]he face of

49

the writing must be stripped of all innuendoes and explanations." *Id.* (quoting *Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006)).

It is impossible to see how the allegedly defamatory statement amounts to defamation *per se* when viewing it in accordance with its ordinary meaning: "We are reviewing your account and were not comfortable with the margins our former employee was getting so we want to go ahead and offer you some new lower pricing." [Dkt. 138-20]. No reasonable person could believe that these words "tend to expose the plaintiff to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people and to deprive him of their friendship, intercourse and society." *Digest Publ'g Co.*, 284 S.W.2d at 834. Nothing about them attributes anything to Webster incompatible with his business or trade or that would impugn his ability to perform his profession. At worst, viewing the statement in the light most favorable to Webster, it is a statement that CellMark thinks its salesman might not have given a customer the best price possible—which is a statement that is made in countless businesses across the country every single day. It is an ordinary, unoffensive statement that is routinely made in business dealings. In no way does it expose Webster to "public hatred, ridicule, contempt or disgrace." *Id.* Moreover, the statement is "more in the nature of opinion" and unlike those that have been found to rise to the high bar for defamation *per se* in similar contexts. *McCoy v. Ten Ten Grp., LLC*, No. 2022-CA-0011-MR, 2023 WL 2618406, at *7 (Ky. Ct. App. Mar. 24, 2023).

Webster cites *Randy's Body Shop, Inc. v. Kentucky Farm Bureau Mutual Insurance Co.* in support of the proposition that an implication of unfitness is sufficient here. No. 2002-CA-001614-MR, 2004 WL 405742, at *3 (Ky. Ct. App. Mar. 5, 2004); [Dkt. 155 at 21]. That court held that "the statement . . . that [one particular employee] was the only honest person in the office at Randy's gives rise to an independent action for defamation." *Id.* The court reasoned that "[t]he necessary implication of the statement that only [one employee] is honest, while not defamatory to [that employee], necessarily implies that the rest of Randy's employees, and therefore Randy's as an entity, are dishonest," and that "[s]uch an allegation of dishonesty is directly injurious to the reputation and business character of Randy's as an entity." *Id.* But *Randy's Body Shop* is distinguishable.

In that case, the publisher made a normative statement striking directly at the allegedly defamed parties' fitness to run a business by invoking their honesty. *Id.* No implication had to be drawn to reach the conclusion that the speaker was impugning the business's propensity for honesty. Instead, the implication drawn was that by stating only one person at the business was honest, the rest of the business was dishonest. *Id.* The words themselves were defamatory because they spoke to the fitness of Randy's to conduct business.

The statement here is not actionable because the words themselves do not impute any quality to Webster that is incompatible with the performance of his profession, making it not defamatory *per se*.

51

4.     Genuine issues of material fact preclude summary judgment on Webster's tortious-interference claim.

CellMark and Webster both move for summary judgment on Webster's claim of tortious interference with prospective business advantage. [Dkt. 138-1 at 20; Dkt. 144 at 32]. Webster argues that CellMark tortiously interfered with his business opportunity for employment at DRC when CellMark sent DRC a letter stating that hiring Webster would create liability for DRC. [Dkt. 144 at 32–33 (citing Dkt. 65-4; Dkt. 65-5; Dkt. 96-7)]. Webster argues that the letter caused DRC to "sideline[]" him for a year, which prevented him from earning commissions. [*Id.*]. Because a genuine dispute of material fact exists as to CellMark's motive, this claim must be submitted to a jury.

Under Kentucky law, to establish a claim of tortious interference with prospective business advantage, a party must prove: "(1) the existence of a valid business relationship or expectancy; (2) that [the defendant] was aware of this relationship or expectancy; (3) that [the defendant] intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages." *Snow Pallett, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012). Motive is an important part of this claim, so to prevail, the "party seeking recovery must show malice or some significantly wrongful conduct." *Id.* (quoting *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 858 (Ky. 1988)).

Webster has plainly established each of these elements except for intent and motive. On those elements, there are genuine issues of material fact. The evidence

52

demonstrates that a reasonable jury could return a verdict for either side on the motive and intent elements.

From CellMark's perspective, the letter was sent for the proper purpose of enforcing the boundaries of the agreements between CellMark and Webster. [Dkt. 138-1 at 20–22]. Webster attached three agreements to his Amended Counterclaim: the APA, [Dkt. 65-1]; the Shareholders' Agreement, [Dkt. 65-2]; and the Employment Agreement, [Dkt. 65-3]. Each of these agreements contains restrictive covenants that allegedly prevented Webster from selling to or soliciting any of the customers he worked with while employed at CellMark or obtaining employment with any company competing with CellMark. [*Id.* at 20–23].

For example, CellMark cites Section 7.2 of the APA as imposing a non-competition obligation on Webster. [Dkt. 138-1 at 20–21 (citing [Dkt. 138-22, APA, at 17])]. That section states, in part, that Principals like Webster must not "engage in the business competitive with" CellMark for a year after their employment ends. [Dkt. 138-22 at 17]. CellMark also cites Sections 8.1 and 8.2 of the Employment Agreement as establishing a non-solicitation obligation. [Dkt. 138-1 at 21 (citing [Dkt. 138-3 at 5])]. Section 8.1 states that Webster must not

> directly or indirectly solicit or sell any of [CellMark's] products or products similar to those sold by [CellMark] to any person, company, firm, or corporation who is or was a customer of [CellMark] within one (1) year prior to the termination of [Webster's] employment.

[Dkt. 138-3 at 5]. Section 8.2 states that Webster must not

> directly or indirectly solicit or sell any of [CellMark's] products or products similar to those sold by [CellMark] to those persons, companies, firms, or corporations who are or were customers of [CellMark] and for whose accounts [Webster] was responsible while in

> the employ of [CellMark]. [Webster] agrees not to solicit such accounts on behalf of [Webster] or any other person, firm, company, or corporation.

[*Id.*]. Thus, CellMark contends that it was merely enforcing its contractual rights that were active for a year from June 7, 2024, when it sent the letter to DRC. [Dkt. 138-1 at 20–22].

If CellMark's explanation is credited, then CellMark will prevail because acting "in good faith to protect a legitimate interest of [one's] own" is a defense to a tortious interference claim. *Bourbon Cnty. Joint Plan. Comm'n v. Simpson*, 799 S.W.2d 42, 45 (Ky. Ct. App. 1990) (citing Restatement (Second) of Torts § 773 (1979)); *Uppal v. Gateway Reg'l Health Sys., Inc.*, No. 2004–CA–000393–MR, 2005 WL 2323174, at *5 (Ky. Ct. App. Sept. 23, 2005) (citing *Hornung*, 754 S.W.2d at 858)). But Webster claims the truth is something else.

From Webster's perspective, CellMark's letter to DRC was sent with malice because CellMark knew the agreements were not broad enough to prevent Webster from obtaining employment with DRC. [Dkt. 144 at 33–34]. Webster cites deposition testimony and letters suggesting CellMark representatives and employees believed his employment at DRC was acceptable. [*Id.*]. In particular, Webster points to a letter dated May 9, 2024, addressed to Jimmy Derrico. [*Id.* (citing [Dkt. 96 at 10; Dkt. 115–18])]. That letter states that Derrico engaged a law firm to provide an opinion on the scope of Webster's restrictive covenants in the Shareholder Agreement and Employment Agreement. [Dkt. 115-18 at 1]. It concludes that those restrictive covenants prohibited Webster from soliciting CellMark customers or employees, among other things, but neglects to state an opinion regarding non-competition

obligations or obligations under the APA.  [Dkt. 115-18 at 1–3].  A letter sent to Webster on June 10, 2024, by the same law firm asserted the same restrictions.  [Dkt. 115-20].

Webster also highlights that CellMark's 30(b)(6) representative testified that Webster could have worked for DRC so long as he was not improperly soliciting.  [Dkt. 144 at 34].  When asked if Webster "could go work for a competitor as long as he didn't try and solicit CellMark's former customers," that representative said, "Yes."  [Dkt. 98 at 150].  And when asked, "Why couldn't Rob Webster go work for DRC as long as he wasn't soliciting the customers?" the representative replied, "I think he could have."  [*Id.*].

Moreover, DRC's letter to CellMark demonstrated that Webster's employment would not violate Sections 8.1 and 8.2 of the Employment Agreement because the letter explained that Webster honored his contractual obligations by not selling to current or former CellMark customers.  [Dkt. 65-4 at 2].  And Webster points out that DRC was not a competitor to CellMark because DRC was a manufacturer of paper products, not a broker.  [*See* Dkt. 144 at 23].  If that assertion is credited, then Webster's employment with DRC would not implicate Section 7.2 of the APA.

For all these reasons, a reasonable jury could conclude not just that CellMark's letter to DRC was sent with the goal of intentionally interfering with Webster's business relationship, but also that it was sent with a malicious and unjustified motive.  *See Bourbon Cnty. Joint Plan. Comm'n*, 799 S.W.2d at 45 ("[M]alice must be shown, but only in the sense of lack of justification for the interference." (citing

55

*Hornung*, 754 S.W.2d at 858)). In other words, one could conclude that CellMark knew it had no valid basis for objecting to Webster's employment and threatening DRC and that it did so anyway for the improper purpose of maliciously harming Webster's career. But a reasonable jury could potentially conclude otherwise. For example, a reasonable jury could conclude that DRC and CellMark were, in fact, competitors. It is also conceivable that a reasonable jury could be persuaded that CellMark reasonably believed DRC's letter was simply a subterfuge. Ultimately, the key point is that these competing theories create a genuine issue of material fact regarding CellMark's motive. And that genuine issue of material fact can only be resolved by a jury. *See Uppal*, 2005 WL 2323174, at *5; *Calor v. Ashland Hosp. Corp.*, Nos. 2007–SC–000573–DG, 2008–SC–000317–DG, 2011 WL 4431143, at *12 (Ky. Sept. 22, 2011). Summary judgment must therefore be denied on Webster's tortious-interference counterclaim.

## C. Evidentiary issues.

In addition to their motions for summary judgment, Webster has also moved to strike some of the evidence CellMark submitted with its summary-judgment briefing.

### 1. The Feldmann Declaration is ignored to the extent it improperly asserts legal conclusions.

Webster moves to strike the Declaration of Beth Feldmann, [Dkt. 138-4], to the extent it is used to support CellMark's Motion for Summary Judgment on Webster's Counterclaims, [Dkt. 138]. [Dkt. 157, Webster's Mot. to Strike Feldmann Decl., at 1]. That Declaration is used by CellMark to support its contention that it did not breach

56

Webster's Employment Agreement because it actually paid Webster more than what he was entitled to receive. [Dkt. 138-1 at 9]. But this is no longer an issue in light of the Court's grant of summary judgment in favor of CellMark on the breach-of-contract claim. So that means the Declaration must be ignored. A declaration offered in support of a motion for summary judgment must "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). And in light of the Court's ruling on Webster's breach-of-contract counterclaim, the Feldmann Declaration is inadmissible as it has no relevance to any fact that is at issue here.

But even setting that point aside, the Court ignores the Feldmann Declaration because it is replete with legal conclusions opining on the extent of CellMark's contractual obligations. [Dkt. 138-4 at 1–2]. The Declaration does not merely state how much Feldmann understands Webster to have been paid based on her personal knowledge, but instead goes further and states that what Webster was paid is an overpayment based on what was required of CellMark under the Employment Agreement. [*Id.*]. The Feldmann Declaration has thus been ignored for the purposes of considering CellMark's Motion for Summary Judgment on Webster's Counterclaims. And, in any event, the Feldmann Declaration has no bearing on what was owed under the Employment Agreement, as the Court has already determined that CellMark did not breach the Employment Agreement.

One final point on this issue: Rather than moving to strike the Feldmann Declaration, Webster should have objected to its use in his response to CellMark's Motion for Summary Judgment. [Dkt. 157]. The Federal Rules of Civil Procedure

generally require such objections to be made in response to a motion for summary judgment rather than a motion to strike. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *see also Sanders v. Armstrong*, No. 09–CV–036–JMH, 2011 WL 589910, at *1 (E.D. Ky. Feb. 10, 2011) (citing 2010 Notes of Advisory Committee). "The Federal Rules of Civil Procedure do not provide for a motion to strike documents other than pleadings." *Cincinnati Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 377 F. Supp. 3d 859, 864 (S.D. Ohio 2019). And briefs in support of summary judgment are not pleadings. *See* Fed. R. Civ. P. 7(a), 12(f). But courts in this circuit regularly construe motions to strike made in similar contexts as objections brought under Federal Rule of Civil Procedure 56(c)(2) and therefore consider the substance of the motions. *See, e.g., Stephenson v. Fam. Sols. of Ohio, Inc.*, No. 1:18CV2017, 2021 WL 795551, at *5 (N.D. Ohio Mar. 2, 2021). When a court construes a motion to strike as an objection to admissibility under Rule 56(c) and grants that motion, it may simply ignore that evidence rather than actually striking the material. *Ramirez v. Bolster & Jeffries Health Care Grp.*, 277 F. Supp. 3d 889, 897 (E.D. Ky. 2017); *Lloyd v. Midland Funding, LLC*, 639 F. App'x 301, 304 (6th Cir. 2016). And that is what the Court elects to do in this instance regarding the Feldmann Declaration.

Of course, district courts have inherent authority to control their dockets, and this authority includes the power to strike documents or portions of documents. *See Cincinnati Ins. Co.*, 377 F. Supp. 3d at 864; *see also Dietz v. Bouldin*, 579 U.S. 40, 47

(2016) (stating that "district courts have the inherent authority to manage their dockets" (citations omitted)); *Am. C.L. Union of Ky. v. McCreary County*, 607 F.3d 439, 451 (6th Cir. 2010) (holding that "based on the district court's power to manage its own docket, the court had ample discretion to strike Defendants' late renewed motion for summary judgment"). But because the particular question at issue here is addressed by Rule 56(c)(2), the Court will adhere to the Rule 56(c) approach rather than using its inherent authority.

2. The Derrico Declaration is likewise ignored because it contains inadmissible hearsay.

Webster also moves to strike the Derrico Declaration, which CellMark attached to its motion for summary judgment, as inadmissible hearsay. [Dkt. 148, Webster Mot. to Strike (citing [Dkt. 136-25, Derrico Decl.])]. CellMark offers several statements by Derrico to argue that Webster attempted to divert CellMark's customers and suppliers to Fortex. [*See* Dkt. 137 at 7; Dkt. 136-25 at 2]. In these statements, Derrico relays what he heard during a phone conversation with Andrew Korn, an employee of Finch Paper—a long-time supplier to CellMark. [Dkt. 136-25 at 2]. During the call, Derrico asked Korn if Finch Paper was selling the same product to Fortex as it did to CellMark, and Derrico claims that "Mr. Korn confirmed that Finch Paper was doing so." [*Id.*]. Then, Korn said, "Robert Webster had directed Finch to work with Fortex as the R.L. Adams business was to be split between Fortex and CellMark." [*Id.*]. According to Derrico, Korn also "explained that the practical effect of this split was that Fortex would get an order for a truck of product and then

59

CellMark would get the next order for a truck of the same product." [*Id.*].  CellMark's

motion for summary judgment cites the Derrico Declaration to say:

> Webster facilitated Fortex obtaining products for that customer from the same supplier CellMark used, meaning that setting up Fortex as a "secondary supplier" was purely illusory.  The supplier, Finch Paper, later told Jimmy Derrico, President of CellMark's Recycling division (under which the Semper CellMark business division sits), that Webster had asked Finch to split the business between Fortex and CellMark, that it was alternating sending trucks to CellMark and Fortex, and that Webster had introduced Sohl and Fortex to Finch.

[Dkt. 136 at 7].

As explained above, Rule 56(c)(2) offers the proper avenue for challenging

material cited in support of a motion for summary judgment:  "A party may object

that the material cited to support or dispute a fact cannot be presented in a form that

would be admissible in evidence."  The Court will again construe Webster's Motion to

Strike as a Rule 56(c)(2) objection, especially given how Webster's response in

opposition to CellMark's motion for summary judgment references the motion to

strike and argues that Derrico's statements contain inadmissible hearsay.  [*See* Dkt.

156 at 16 & n.3].

Webster objects on the ground that the Derrico Declaration contains two levels

of hearsay that are inadmissible under Federal Rule of Evidence 802 and therefore

cannot be considered in support of a motion for summary judgment.  [Dkt. 148 at 3;

Dkt. 185 at 8].  Hearsay is defined as an out-of-court statement offered to prove the

truth of the matter asserted in the statement.  Fed. R. Evid. 801(c).  However, a

statement by an opposing party or its agent that is offered against that opposing party

is not hearsay.  Fed. R. Evid. 801(d)(2).  Further, "[a] statement that is not offered to

prove the truth of the matter asserted but to show its effect on the listener is not hearsay." *United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015) (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009)).  If a hearsay statement itself contains a statement that qualifies as hearsay, then the Court must assess each level to determine if any exceptions or exclusions apply.  *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577–78 (6th Cir. 2012).

Derrico's statement that Korn said that "Webster had asked Finch to split the business between Fortex and CellMark," [Dkt. 136-25 at 2], cannot be used to support Cellmark's motion for summary judgment because the second level is inadmissible hearsay.  The first level, Webster's ask of Finch Paper, is not hearsay because CellMark is offering Webster's statement against Webster—CellMark's party opponent—and this level is being offered to show the effect of Webster's statement on Finch Paper.  But the second level, Korn's relaying of this statement to Derrico, is hearsay.  Korn and Finch are not parties to the case, and Korn's out-of-court statement is being offered to prove the truth of the matter asserted, which is that Webster made the statement that Korn claims he made.  The listener in this instance is Derrico, but Derrico's state of mind or reliance on Korn's statement is irrelevant to CellMark's point.  *Cf. Victor v. Reynolds*, 165 F.4th 987, 997–98 (6th Cir. 2026).  Accordingly, this statement is inadmissible to support CellMark's motion for summary judgment.

Derrico's statement about Korn's explanation of the trucks is also inadmissible hearsay.  CellMark offers this out-of-court statement to prove that Fortex and

61

CellMark were receiving the trucks on an alternating basis due to the split, which "facilitated Fortex obtaining products . . . from the same supplier CellMark used." [Dkt. 137 at 7]. The thrust of CellMark's argument on this point relies on the truth of Korn's statement to Derrico about the arrangement with the trucks. CellMark cannot point to any exception or exclusion that would apply here, so the Court also finds this statement inadmissible and will sustain Webster's Rule 45(c)(2) exception.

        3.      <u>The exhibits attached to CellMark's response to Webster's Motion to Exclude Expert Jay Cunningham will be ignored.</u>

Webster also moves to strike exhibits attached to CellMark's Response to Webster's Motion to Exclude Jay Cunningham, [Dkt. 131]. [Dkt. 172 at 1]. Webster says that CellMark relies on these various exhibits to support its claims against Webster and CellMark's damages. [*Id.* at 1–2 (citing Dkt. 153)]. He requests that the court not consider the exhibits at summary judgment. [*Id.*]. That motion is denied as moot because the relief requested—not considering the evidence on summary judgment—has already been granted. Without now commenting on the admissibility of the objected-to exhibits, the Court has determined that a genuine issue of material fact exists regardless of CellMark's passing reference to Apex Paper and the Miller Group in its response brief to Webster's Motion for Summary Judgment.

## III.   <u>Conclusion</u>

For these reasons, it is hereby **ORDERED** as follows:

1)     CellMark, Inc.'s Motion for Partial Summary Judgment, [Dkt. 136], is **DENIED**.

2)      CellMark's Motion for Summary Judgment on Webster's Counterclaims, [Dkt. 138], is **GRANTED in part** as it relates to Counts I, II, and III of Robert Webster's Amended Counterclaim, [Dkt. 65].   CellMark's Motion for Summary Judgment, [Dkt. 138], is **DENIED in part** as it relates to Count IV of Webster's Amended Counterclaim, [Dkt. 65].

3)      Webster's Motion for Summary Judgment, [Dkt. 144], is **DENIED** and all claims against Webster will proceed to trial in accordance with this opinion.

4)      Fortex's, Sohl's, and Bowman's Motion for Summary Judgment, [Dkt. 141], is **GRANTED in part** and **DENIED in part** in accordance with this opinion.

5)      Webster's Motion to Strike CellMark's Declaration of Jimmy Derrico, [Dkt. 148], is **GRANTED** to the extent that the declaration will be ignored rather than stricken from the record.

6)      Webster's Motion to Strike CellMark's Declaration of Beth Feldmann, [Dkt. 157], is **GRANTED** to the extent that the declaration will be ignored rather than stricken from the record.

7)      Webster's Motion to Strike CellMark's Exhibits Attached to CellMark's Response to Webster's Motion to Exclude Jay Cunningham, [Dkt. 172], is **DENIED as moot**.

8)      Webster's Notice of Supplemental Filing on CellMark's Fiduciary Duty Claim, [Dkt. 217], shall be **STRICKEN** from the record.

Signed this 20th day of May, 2026.



S. Chad Meredith, District Judge
United States District Court
Eastern District of Kentucky