UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at Covington

| | | |
|---|---|---|
| CELLMARK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:24-cv-00181-SCM-CJS |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| ROBERT WEBSTER, et al., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Before the Court are two motions to exclude the testimony of Jay Cunningham, Plaintiff CellMark, Inc.'s expert witness. One motion was filed by Defendant Rob Webster, and the other was filed by the Fortex Defendants (Fortex Americas, LLC, Dinah Bowman, and Göran Sohl). [Dkt. 131, Webster's Mot. to Exclude; Dkt. 134, Fortex Defs.' Mot. to Exclude]. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** both Motions to Exclude. Cunningham will not be permitted to testify at trial about the measure of disgorgement that he believes is appropriate or the measure of CellMark's lost profits based on an arbitrary seven-month period after the expiration of Webster's non-compete.

## I.    Facts

CellMark brings several claims in this case, including: (Count I) breach of fiduciary duty (against Webster); (Count III) breach of restrictive covenants (against Webster); (Count IV) tortious interference with contractual relations (against

Bowman, Sohl, Fortex, and DRC Industries, Inc.[1]); (Count V) violation of the Kentucky Uniform Trade Secrets Act (against all Defendants); (Count VI) violation of the Defend Trade Secrets Act (against all Defendants); and (Count VIII) civil conspiracy (against all defendants). [Dkt. 64, Am. Compl.]. Cellmark retained Jay Cunningham to offer expert testimony on its damages. He was tasked with calculating two main measures of CellMark's damages in this matter: (1) the amount of "unjustly received compensation" that CellMark believes Webster must disgorge; and (2) the lost profits CellMark believes resulted from the Defendants' alleged misconduct. [Dkt. 140-39, Cunningham Report, at 4]. Cunningham opined in his Report that Webster received $493,594 in improper compensation and CellMark suffered $4,926,697 in lost profits. [*Id.* at 5].

Cunningham used distinct methodologies to determine each amount. For disgorgement, he calculated the supposedly improper compensation paid to Webster by tallying up Webster's salary and the bonuses, incentive payments, profit sharing payments, and health insurance payments CellMark made to Webster during his time as CellMark's employee from May 2023 until June 2024. [*Id.* at 44]. The source cited for this calculation was a single payroll spreadsheet. [*Id.*].

---

[1] DRC Industries, Inc. was a defendant in this case until it settled with CellMark. [Dkt. 107, Joint Mot. to Dismiss DRC; Dkt. 147, Dismissal Order]. A fuller account of the background facts is contained in this Court's Memorandum Opinion and Order issued on May 20, 2026, [Dkt. 218, May 20, 2026 Mem. Op. & Order]. That Memorandum Opinion and Order also disposed of other causes of action that are not discussed here. [*Id.*].

2

Cunningham's methodology for calculating lost profits was more complex. Cunningham first reviewed CellMark's profit and loss statements for the division where Webster previously worked. [*Id.* at 22]. Cunningham identified 15 customers with relationships that were allegedly affected by the Defendants' conduct and analyzed CellMark's historical financial information to identify profit and loss trends relating to those customers. [*Id.* at 23–25]. Then, Cunningham estimated the predicted gross profits from each customer using historical data and subtracted the actual gross profits generated by consummated sales to those customers, which yielded a figure of lost gross profit. [*Id.* at 24]. Based on historical financial data, Cunningham then subtracted the estimated expenses that CellMark would have needed to incur in order generate the lost profits, which produced the final figure after accounting for the relevant time period. [*Id.* at 25].

Cunningham determined that the relevant time period for lost profits varied according to each particular customer, but generally started "in early 2023," extended through the end of Webster's non-compete period in June 2025, and concluded after "an additional seven-month transition period through the end of 2025." [*Id.* at 23–24]. In support of the "additional seven-month transition period," Cunningham cited sales data from Fortex that he says indicated it took Fortex 7.6 months to generate sales from "diverted [CellMark] customers in the period following Bowman's departure." [*Id.* at 24 n.41]. The additional seven-month period was used for Cunningham's lost-profits analysis of every CellMark customer.

Cunningham's lost-profits analysis treated two CellMark customers differently than the rest.  First, he created a "unique[]" damage period for CellMark customer Multi-Color Corporation, which covered "an additional ten months over the damage period utilized for all other customer[s]."  [*Id.* at 24].  To support this extended damage period, Cunningham pointed to his understanding that CellMark had an annual exclusivity agreement with Asia Pulp and Paper, the supplier for Multi-Color Corporation, that lapsed in March 2024.  [*Id.*].  Cunningham also assumed that:  (1) Webster had a duty to renew that agreement in March 2024; (2) the agreement would have been renewed again in March 2025 if Webster complied with his non-compete; (3) the Defendants would consequently have been unable to start building a relationship with Multi-Color Corporation until March 2026 due to the twice-renewed exclusivity agreement with Asia Pulp and Paper; and (4) it would take the Defendants an additional seven months to secure sales from Multi-Color Corporation—resulting in a unique damage period that extended until October 2026.  [*Id.*].

Second, Cunningham used a modified model to calculate lost profits relating to CellMark customer Camelot Paper, Inc. / Integrity Fiber Supply, LLC.  CellMark sold products to Camelot before Camelot declared bankruptcy in 2023 and was acquired by Integrity in 2024.  [*Id.* at 25].  After Integrity integrated Camelot into its business, Cunningham reports that CellMark's sales figures "were depressed from historical levels," whereas Fortex "generated over 10x more sales to Integrity in a 10-month period than [CellMark's predecessor] generated over the previous year and a half."  [*Id.* at 26].  To calculate lost profits for Camelot / Integrity, Cunningham assumed

4

that Fortex's average monthly sales from August 2024 through May 2025 would have instead gone to CellMark, applied CellMark's predecessor's historical average profit margin to those sales figures, projected the trend to continue through December 2025, and subtracted estimated expenses and the actual gross profit generated by CellMark's sales to Camelot / Integrity from 2024 through May 2025. [*Id.*]. Cunningham's analysis is summarized in compilations of his calculations showing gross profit projections, lost gross profits, and lost profits by CellMark customer. [*Id.* at 39–42].

## II.    Analysis

Webster and the Fortex Defendants raise a bevy of issues with Cunningham's analysis. [Dkt. 131; Dkt. 134]. Webster argues that Cunningham's disgorgement analysis is improper because it is simply arithmetic. [Dkt. 131 at 23–24]. Both Webster and the Fortex Defendants generally argue that Cunningham's overarching lost-profits methodology is defective and, separately, that several distinct elements of his analysis are fatally flawed. The Court analyzes each argument in turn.

### A.    Motion to Exclude Standard.

Rule 702 "gives district courts a 'gatekeeping role' in screening the reliability of expert testimony." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 668 (6th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). District courts fulfill that role when presented with a motion to exclude expert evidence by determining "whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (quoting *Daubert*, 509 U.S. at 597). The court's inquiry generally

5

involves consideration of a "non-exclusive checklist" of factors, such as "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)).

Federal Rule of Evidence 702 provides that an expert witness may only offer their expert opinion if:

> [1] the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; [2] the testimony is based on sufficient facts or data; [3] the testimony is the product of reliable principles and methods; and [4] the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The rub is this: "[T]he role of the district court 'is not to determine whether [the expert opinion] is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.'" *Evans v. Novolex Holdings, LLC*, No. 20-98-DLB-CJS, 2024 WL 5275558, at *2 (E.D. Ky. Mar. 25, 2024) (quoting *In re Scrap Metal*, 527 F.3d at 529–30)). "If expert testimony is 'speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison,' then it must be excluded" as unreliable. *Martin v. Brighthouse Life Ins. Co.*, No. 21-CV-02923 (MMG), 2025 WL 2731710, at *3 (S.D.N.Y. Sept. 25, 2025) (quoting *Nachimovsky v. Nike, Inc.*, No. 22-866, 2023 WL 4504461, at *1 (2d Cir. July 13, 2023)). Even if expert testimony is sufficiently reliable, it may nonetheless be excluded as unhelpful to the jury when it is "irrelevant" or "when it merely deals with a proposition that is not

6

beyond the ken of common knowledge." *Redmond v. United States*, 194 F. Supp. 3d 606, 615 (E.D. Mich. 2016) (citation omitted).  The burden is on the proponent of the expert's testimony to show by a preponderance of proof that "all the foundational elements of admissibility" are established.  *Id.* (citing *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001)).

### B.   Cunningham's disgorgement analysis must be excluded because it is unhelpful.

CellMark believes it is entitled to disgorgement as a remedy for Webster's alleged misconduct.  [*See* Dkt. 158, CellMark's Resp. to Mots. to Exclude, at 24]; *see also Kerns v. Beam*, No. 3:15-cv-212-DJH-DW, 2018 WL 2449206, at *1 n.2 (W.D. Ky. May 31, 2018) (explaining that, under Kentucky law, disgorgement is a "remed[y] that necessarily rise[s] and fall[s] with" a breach of fiduciary duty claim (citations omitted)).  To quantify this remedy, CellMark had Cunningham analyze the sum of money Webster should supposedly disgorge.  To do that, Cunningham added up figures from a CellMark payroll spreadsheet.  [Dkt. 140-39 at 34, 44; *id.* at 27 ("I was provided with Webster's monthly compensation from May 2023 through the termination of his employment in June 2024.")].

Webster argues that since Cunningham's disgorgement analysis is mere "basic math," it must be excluded because it is not beyond the ken of common knowledge. [Dkt. 131 at 23–24].  In other words, Webster argues that it is irrelevant and unhelpful to the jury.  CellMark responds by saying Cunningham relied on his experience with economic damages to perform the calculation and that "[e]ven basic mathematical calculations are admissible" as expert evidence.  [Dkt. 158 at 24].

Because the analysis Cunningham undertook regarding disgorgement is no more complex than simply adding up spreadsheet cells documenting the sums CellMark paid Webster as an employee from May 2023 until June 2024, the Court concludes it must be excluded as unhelpful to the jury.

The parties agree that Cunningham did basic math to analyze the amount of disgorgement that is allegedly owed. "[C]ourts have found 'basic math' arguments persuasive and granted motions to exclude on such grounds." *Rumpke of Ky., Inc. v. Terracon Consultants, Inc.*, No. 2:19-CV-182-CHB, 2024 WL 4356572, at *22 (E.D. Ky. Sept. 30, 2024) (citations omitted). Indeed, this Court recently excluded expert testimony when the expert's "calculation [wa]s relatively straight-forward," the expert "performed no 'independent analysis,'" and the expert "used evidence that will be readily available to the jury." *Id.* at *22–23 (quoting *Advanced Drainage Sys., Inc. v. Quality Culvert Inc.*, No. 2:12-1121, 2015 WL 1299368, at *8 (S.D. Ohio Mar. 23, 2015)). Such is the case here.

Like the expert opinion at issue in *Rumpke*, which was based solely on simple arithmetic and was disconnected from any other admissible expert opinions, the jury in this case "has no need for an opinion because the jury can easily reach reliable conclusions based on common sense, common experience, the jury's own perceptions, or *simple logic*." *Id.* at *24 (quoting *Ray v. AT&T Mobility LLC*, No. 2:17-cv-68, 2020 WL 535787, at *7 (E.D. Ky. Feb. 3, 2020)) (emphasis in original). The undersigned therefore follows suit and concludes that Cunningham's opinions on disgorgement "should be excluded on such grounds." *Id.*; *see also Ray*, 2020 WL 535787 at *7 ("The

lay jury is endowed with the common knowledge necessary to add, divide, and multiply the figures presented by the parties without 'expert' testimony.").

CellMark remains free to adduce fact testimony about what it paid Webster and when, but it may not endow that simple fact evidence with the improper "imprimatur of an expert." *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 12748012, at *1 (N.D. Ohio July 16, 2015) (quoting *Rosenfeld v. Oceania Cruises, Inc.*, 682 F.3d 1320, 1340 (11th Cir. 2012)).

### C.    Cunningham's overall lost-profits methodology is not fatally flawed.

The Court summarized Cunningham's general lost-profits methodology above. There is no suggestion that Cunningham is unqualified as an expert or that his selected methodology (*i.e.*, the "but-for" damages model used to calculate lost profits) is itself fatally deficient such that his entire analysis is excludable. Rather, Webster and the Fortex Defendants both argue that Cunningham's application of that methodology to calculate lost profits is defective and that all his opinions should therefore be excluded.

Webster contends that Cunningham failed to follow "a reliable methodology" because Cunningham "did not consider the other factors that could have caused CellMark's losses, making his opinion unreliable and inadmissible." [Dkt. 131 at 8–9]. The Fortex Defendants primarily contend that Cunningham's methodology relied too much on CellMark's "management's belief, not on an analysis of CellMark's" financial data, and also failed to consider "whether industry trends or market conditions could have impacted sales." [Dkt. 134 at 5]. In short, the Fortex

Defendants argue that Cunningham "accepted management's positions without research, analysis, or the consideration of factors he considers necessary to his calculation," and so his entire analysis is fatally flawed. [*Id*. at 7]. Both sets of arguments boil down to the contention that Cunningham did not consider other potential causes of CellMark's losses and deferred too much to CellMark's version of events.

While these may be reasons to criticize Cunningham's analysis, they are not valid grounds for excluding all of Cunningham's lost-profits testimony. "The reliability inquiry focuses 'solely on the principles and methodology, not on the conclusions they generate.'" *Johnson v. BLC Lexington SNF, LLC*, 478 F. Supp. 3d 578, 589 (E.D. Ky. 2020) (quoting *Daubert*, 509 U.S. at 595). And the principles and methodology that Cunningham employed are sound. It is true that expert testimony "should be excluded if it is based on 'unrealistic assumptions,'" "facts that [a]re clearly contradicted by the evidence," or "unsupported speculation." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012) (citations omitted). But whether an expert did not consider all possible contributors to lost profits is an issue that can be addressed via vigorous cross-examination, which is "the traditional and appropriate means of attacking" evidence or extrapolations that Webster and the Fortex Defendants believe are shaky. *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)). Indeed, that is the point of having rebuttal expert witnesses in cases such as this. *See Benedict v. United States*, 822 F.2d 1426, 1429 (6th Cir. 1987) ("[Expert's] testimony regarding the accuracy of the methodology would have 'served

10

the permissible rebuttal function of counteracting the testimony of the opposing expert witness.'" (quoting *United States v. Posey*, 647 F.2d 1048, 1052 (10th Cir. 1981))).

It is also true that Cunningham adopted a particularly rosy view of how things would have supposedly turned out for CellMark had the alleged misconduct not occurred—and did so based primarily on information provided to him by CellMark. But Cunningham is entitled to that optimistic perspective so long as it is based on evidence and not clearly contradicted by the evidence. *Andler*, 670 F.3d at 728 ("Although Andler did not work full-time before her injury, Selby's projection that she would work full-time is not 'clearly contradicted by the evidence.'" (quoting *Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 9 (D.D.C. 1996))). As noted above, Cunningham analyzed CellMark's historical sales figures and financial performance to create his projections. The Court cannot say that Cunningham's entire lost-profits analysis is so "clearly contradicted" by the evidence in this case that it must be excluded in toto merely because he believed that CellMark's historical performance would have continued undisturbed but for the alleged conduct of Webster and the Fortex Defendants.

To be sure, there are factual disputes about whether CellMark would have maintained particular customer and supplier relationships going forward. Cunningham may well have been too optimistic in assuming that CellMark would have reaped roughly the same profits as it had in years prior. But "'a well-accepted way to criticize damages estimates' is for a rebuttal expert to 'testify that, while the

11

expert's report . . . assumes . . . facts, X, Y, and Z, the expert's analysis is seriously flawed if the jury does not accept X, Y, and Z as true.'" *Graystone Funding Co., LLC v. Network Funding, L.P.*, 598 F. Supp. 3d 1228, 1247 (D. Utah) (emphases omitted) (quoting *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-Civ-COOKE/TURNOFF, 2011 WL 2295269, at *5 (S.D. Fla. June 7, 2011)). So Cunningham's reliance on CellMark's prior financial performance and his derivative assumptions are issues that are "subject to cross examination and go[] to the weight of the testimony, not its admissibility." *Advanced Drainage Sys.*, 2015 WL 1299368, at *9 (citing *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)); *see also Andler*, 670 F.3d at 729 ("[I]t is not proper for the Court to exclude expert testimony merely because the factual bases for an expert's opinion are weak." (quotations and citations omitted)).

In sum, Cunningham's overall methodology is not so defective or unreliable as to render all of his testimony about lost profits completely excludable. Many of the factors that Webster and the Fortex Defendants raise as issues with Cunningham's analysis, like whether Cunningham properly accounts for monetary inflation, customer service and attrition rates, employee turnover, or broader market conditions, are endemic to the business of estimating lost-profits damages. They are not grounds for wholesale exclusion in this case. On the whole, Cunningham reliably applied an accepted methodology to produce opinions that are generally "based upon facts in the record, … not assumptions or guesses." *Graham Packaging Co., L.P. v. Ring Container Techs., LLC*, No. 3:23-cv-110-RGJ-RSE, 2026 WL 1454157, at *20

12

(W.D. Ky. May 22, 2026) (quotations and citations omitted).  And so any alleged weaknesses in the factual bases underlying those opinions are matters that go to the weight of his opinions, not their admissibility.  *See id.*; *see also Factory Mut. Ins. Co. v. CIMCO Refrigeration, Inc.*, No. 5:24-CV-17-REW-EBA, 2026 WL 821198, at \*10 (E.D. Ky. Mar. 24, 2026) ("[M]ere weaknesses in the factual basis of an expert witness' opinion … bear on the weight of the evidence rather than on its admissibility." (quoting *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1224 (6th Cir. 2025))).  Thus, the Court will not exclude all of Cunningham's testimony, but the Defendants are free to cross-examine Cunningham and expose any weaknesses they perceive in the application of his methodology at trial.

### D.    Cunningham's invention of an unsupported seven-month "transition period" is improper and should be excluded.

While Cunningham's overall methodology is not fatally flawed, one element of his analysis is.  Webster and the Fortex Defendants assert that when Cunningham tacked on a seven-month "transition period" to the damages period for each CellMark customer, he impermissibly relied on baseless speculation.  [Dkt. 131 at 16; Dkt. 134 at 10].  The Court agrees.  Cunningham will therefore not be permitted to testify about the seven-month "transition period" at trial or express opinions that in any way rely on calculations involving that period.

When Cunningham's Report discussed the time period he used to analyze lost profits, he noted that he "included an additional seven-month transition period" for every customer because he believed Webster's year-long noncompete period would, in turn, cause an additional "reasonable delay" before Webster could successfully solicit

13

customers.  [Dkt. 140-39 at 23–24].  Cunningham's choice of a seven-month period, he asserted, was "based upon an estimated average time to solicit and onboard customers, as well as order and receive associated product."  [*Id.* at 24].  But Cunningham cited no evidence in support of this "estimated average"—he did not, for example, consult industry data to establish a range for how long it might reasonably take a player in the market to develop a relationship with a customer currently being serviced by another supplier or how long it would generally take to build up an inventory to service such clients.  Indeed, there is no suggestion that he "averaged" anything at all.

Instead, Cunningham's Report pointed only to a single document cataloguing "sales data [he] received from Fortex," which suggested that Fortex "generated sales from diverted Cell[M]ark customers" after "7.6 months."  [*Id.* at 24 n.41].  But after reviewing that document, [Dkt. 114-10, Exhibit 57 to Dep. of Jay Cunningham], the Court is left with the firm impression that it does no such thing.  The document is a ledger of Bowman's aggregate sales figures from August 2024 to May 2025 and also contains a list of customers to whom Bowman sold products.  It does not indicate when Bowman made any sales to CellMark's customers.  [*See id.*].  It does suggest, however, that Bowman started making substantial sales for Fortex as soon as August 2024—weeks after she left CellMark at the end of May 2024.  [*See id.*; *see also* Dkt. 94, Dep. of Dinah Bowman, at 28, 96–97].  The document lends no support to Cunningham's assumption that it would take seven months to develop relationships with CellMark's customers.  And Cunningham pointed to nothing else that would.

14

Thus, there are no "facts in the record that create a reliable foundation" for this part of Cunningham's testimony. *Johnson*, 478 F. Supp. 3d at 590.

Cunningham's seven-month transition period is the product of bare speculation. Cunningham himself tacitly acknowledged this: When questioned at his deposition about his basis for the transition period, Cunningham testified that the "seven-month period is an assumption," that he did not "have data that suggests . . . how long does it take to get that customer," and that there was no other data point that he could point to that would back up his choice to assume a seven-month transition period—or any other quantified time period, for that matter. [Dkt. 95, Dep. of Jay Cunningham, at 315–16]. All Cunningham could say was that he thought there should be a "reasonable assumption" about how long it would have taken Webster to solicit customers after his noncompete period ended. [*Id.* at 317]. But neither his Report, nor the sole document it cited, nor his deposition testimony indicate why his assumption of seven months was reasonable or realistic.

Expert testimony "should be excluded if it is based on 'unrealistic assumptions'" or "unsupported speculation." *Andler*, 670 F.3d at 727 (citations omitted). Cunningham's arbitrary seven-month "transition period" relies on both. This is a prime example of the sort of baseless testimony that courts may properly exclude. *Id.* Cunningham may not testify at trial as to any "transition period" following the term of Webster's noncompete.

15

**E.     The Court will not exclude Cunningham's opinions on lost profits related to Camelot / Integrity.**

Webster and the Fortex Defendants next argue that Cunningham's analysis of lost profits relating to Camelot / Integrity is fatally defective because it is likewise too speculative.  [Dkt. 131 at 19; Dkt. 134 at 13–14].  CellMark responds by citing documentary evidence indicating that CellMark sold products to Camelot before its bankruptcy and sold products to Integrity in 2024 through a former Camelot representative that Integrity retained after Camelot was acquired by Integrity, thereby laying a foundation for Cunningham's assumption of CellMark's continued sales.  [Dkt. 158 at 20].  CellMark also notes that after Integrity purchased Camelot out of bankruptcy, it created a new division to be run by the same Camelot representative who was Webster's "primary point of contact" at Camelot.  [*Id.*].

This is a close call.  On the one hand, it seems tenuous to assume a company that acquired a CellMark customer after its bankruptcy would continue to purchase products from CellMark as though nothing had changed.  Indeed, the document Cunningham cites for the proposition that CellMark expected future business with Integrity via Webster plainly does not reflect any firm purchasing commitment from Integrity.  [Dkt. 114-6, Exhibit 51 to Dep. of Jay Cunningham].  On the other hand, there is evidence that Integrity continued to purchase products from CellMark via the relationship Webster fostered with Camelot's representative (whom Integrity kept on board) after Integrity acquired Camelot and that there was an ongoing relationship with CellMark.  [*See* Dkt. 158 at 20–21].  And there is evidence that Fortex made large volumes of sales shortly thereafter.  [*Id.*].  Bearing in mind that

16

there is thumb on the scale in favor of admitting expert testimony, the Court is reluctant to exclude Cunningham's testimony about lost profits relating to Camelot / Integrity. *See Martin v. Polaris, Inc.*, No. 24-5852, 2025 WL 3094123, at *7 (6th Cir. Nov. 4, 2025) (noting that *Daubert* has a "presumption in favor of subjecting 'shaky but admissible evidence' to the traditional adversarial process"). There is a distinction between expert testimony that is unreliable and that which is reliable, but debatable. *See Martin*, 2025 WL 2731710, at *3 (quoting *Roman v. Sprint Nextel Corp.*, No. 12-CV-276 (VEC), 2014 WL 5026093, at *4 (S.D.N.Y. Sept. 29, 2014)). And this appears to be the latter. Therefore, the Court will not exclude Cunningham's testimony relating to Camelot / Integrity. But, as with other elements of Cunningham's analysis, nothing stops the Defendants from engaging in vigorous cross-examination of Cunningham to underscore any weaknesses in his analysis that they believe will help the jury evaluate his testimony.

**F.    No other theories that would justify partial exclusion apply.**

Webster and the Fortex Defendants raise a series of additional arguments for partial exclusion of Cunningham's opinions. Those arguments are unavailing.

First, the Defendants take issue with Cunningham's unique damages period for Multi-Color Corporation. [Dkt. 131 at 17; Dkt. 134 at 10]. They point to deposition testimony from CellMark's corporate representative suggesting that CellMark wanted to renegotiate the terms of its exclusivity agreement with Asia Pulp and Paper, and so—they argue—it is speculative whether CellMark would have maintained and renewed the exclusivity agreement upon which Cunningham predicated his lengthy damages period. [Dkt. 131 at 18–19; Dkt. 134 at 10–11].

17

CellMark responds by pointing to documentary evidence suggesting that CellMark would have renewed the exclusivity agreement but for Webster's alleged wrongful conduct. [Dkt. 158 at 18–19]. While Cunningham's analysis is contingent on scenarios that ultimately did not come to pass, it is nonetheless supported by some evidence in the record and is not "clearly contradicted" by the evidence in this case. *Andler*, 670 F.3d at 727 (quoting *Boyar*, 954 F. Supp. at 9). In short, there is a factual dispute about whether CellMark would, in fact, have renewed its exclusivity agreement with Asia Pulp and Paper and continued on as an exclusive supplier for Multi-Color Corporation's needs for months after Webster's departure. Cunningham is therefore allowed to assume that CellMark would have done so. But the Defendants are equally allowed to contest the veracity of the facts underlying his assumption and to vigorously cross-examine Cunningham to determine the effect on his analysis if the jury does not credit CellMark's evidence. *Graystone Funding Co., LLC*, 598 F. Supp. 3d at 1237.

Second, Webster raises the issue of inflation, suggesting that Cunningham's assumption of a 3.5% yearly price increase benefitting CellMark was unsupportable in light of "market data showing an industry in decline." [Dkt. 131 at 21]. Webster cites no caselaw in support of this argument, and the Court is unaware of any that would suggest that exclusion is the proper course of action here. Rather, the Sixth Circuit has noted in the analogous context of an expert determining lost earning capacity that "use of projected inflation and interest rates . . . was proper." *Andler*, 670 F.3d at 729 n.11. The Court concludes that the issue of whether Cunningham's

assumptions about inflation and market conditions were too optimistic is better addressed through cross-examination than outright exclusion. *Graystone Funding Co., LLC*, 598 F. Supp. 3d at 1237; *Daubert*, 509 U.S. at 596.

Third, Webster contends that "Cunningham attributes customer sales declines to Webster" even though "CellMark's corporate representative admitted there is no evidence implicating Webster." [Dkt. 131 at 21]. Of course, this entire dispute is about whether Webster diverted business away from CellMark.[2] This is not an instance where an expert's methodologies or core assumptions are "clearly contradicted by the evidence." *Andler*, 670 F.3d at 728 (quoting *Boyar*, 954 F. Supp. at 9). Arguments rooted in factual disputes over what the evidence does and does not show and the related effects on an expert's output are properly resolved through cross-examination—not wholesale exclusion. *Daubert*, 509 U.S. at 596 (citing *Rock*, 483 U.S. at 61). Indeed, Webster points out that Cunningham withdrew his analysis of lost profits for two CellMark customers at his deposition after being confronted

---

[2] Webster asserts that an expert's opinion may not be based on "the plaintiff's theory of the case" and that Cunningham improperly assumed Webster's conduct caused CellMark's decline in sales to certain customers without sufficient evidence. [Dkt. 131 at 22]. But "it is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion." *Kirkbride v. Kroger Co.*, 349 F.R.D. 160, 177 (S.D. Ohio 2025); *see also Rhoads Indus., Inc. v. Shoreline Found.*, Nos. 15-921, 17-266, 2021 WL 2778562, at *30 (E.D. Pa. July 2, 2021) (noting that expert's "damages report is predicated on the assumption that Rhoads will prevail on issues of liability, including causation" and that "[a]ll damages expert opinions are dependent . . . on the assumption that liability has been proven." (quoting *Dorman Prods., Inc. v. Paccar, Inc.*, 201 F. Supp. 3d 663, 690 (E.D. Pa. 2016), *as amended* (Oct. 17, 2016))).

with an apparent lack of evidentiary support.[3]  [Dkt. 131 at 22].  If Cunningham's analysis of other CellMark customers is likewise flawed, that conclusion can be drawn out through similar vigorous cross-examination at trial.

Finally, Webster contends that Cunningham goes beyond the scope of his expertise by offering certain statements about "industry customs and standards" in the paper industry.  [Dkt. 131 at 23].  The Court does not find this argument convincing.  Like Webster's expert, Joshua Shilts, Cunningham will be permitted to testify about industry conditions and customs of which he is aware and how they factored into his analysis—and he may similarly be cross-examined about how he obtained such knowledge or its reliability.  [Dkt. 131 at 23; Dkt. 224, May 26, 2026 Mem. Op. & Order, at 14]; *Daubert*, 509 U.S. at 596 (citing *Rock*, 483 U.S. at 61).  If Webster can show at trial that Cunningham cannot establish that those facts about the paper industry are reliable, then his testimony on related points could be excluded or limited.  But for now, the Court concludes that Cunningham should be allowed to testify about what he understands are paper industry norms and how they inform his analysis of CellMark's lost profits.

---

[3] Webster identifies these customers as "Bufkor and Larger Than Life," [Dkt. 131 at 22], but it appears that the two customers about whom Cunningham expressed doubt at his deposition were Bufkor and PVC Tech.  [*See* Dkt. 95 at 141–43].  The Fortex Defendants argue that Cunningham should be prevented from testifying about these two customers because he acknowledged a lack of evidentiary support to include them in his analysis.  [Dkt. 134 at 15].  While "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), the Court reserves judgment on this issue unless and until Cunningham reverses course and attempts to testify about either Bufkor or PVC Tech at trial.

### III.    Conclusion

For these reasons, it is hereby **ORDERED** as follows:

1)    Webster's Motion to Exclude Cunningham, [Dkt. 131], and the Fortex Defendants' Motion to Exclude Cunningham, [Dkt. 134], are **GRANTED IN PART** and **DENIED IN PART** consistent with this Opinion.

2)    Cunningham will not be permitted to testify at trial about disgorgement or the amount of money that he believes should be subject to disgorgement.

3)    Cunningham will not be permitted to testify at trial about the measure of CellMark's lost profits attributable to the seven-month "transition period" following the expiration of Webster's non-compete, nor will he be able to present any damages opinions that incorporate or rely on any calculations that include damages attributable to that seven-month "transition period."

4)    Cunningham may offer testimony at trial about CellMark's lost profits relating to its relationships with Multi-Color Corporation and Camelot Paper, Inc. / Integrity Fiber Supply, LLC.

5)    Cunningham may offer testimony at trial about the effect of inflation and industry customs and standards on CellMark's lost profits.

Signed this 29th day of May, 2026.



S. Chad Meredith, District Judge
United States District Court
Eastern District of Kentucky